906 F.Supp. 1302 (1995)
Kathy DAVIS, Plaintiff,
v.
AMERICAN GENERAL LIFE & ACCIDENT INSURANCE COMPANY, Defendant.
No. 1:94CV66SNL.
United States District Court, E.D. Missouri, Southeastern Division.
August 31, 1995.
*1303 James M. Turnbow, Pelts and Stokley, Hayti, MO, for plaintiff.
Keith A. Rabenberg, Armstrong and Teasdale, St. Louis, MO, for defendant.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff has filed this ERISA action to recover benefits due and to enjoin the defendant from terminating her disability benefits under a long-term employee disability plan. This matter is before the Court on the plaintiff's motion for summary judgment (# 14), filed March 3, 1995 and defendant's motion for summary judgment (# 16), filed March 3, 1995. Responsive pleadings have been filed. Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary *1304 judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court turns to an examination of the facts.
The facts in this case are largely undisputed. On January 3, 1987 while working as an insurance agent in the defendant's employ, plaintiff suffered head injuries resulting in a significant loss of vision in her left eye. On March 3, 1988 she became eligible for long-term disability benefits under the "regular occupation period" provision of the defendant's Long-Term Disability Plan (hereinafter referred to as simply the "Plan"). Defendant's Exhibit A  Plan, Article II, § 2.1(ff)(i).[1] This provided twelve (12) months of disability benefits as long as the plaintiff was unable to perform each and every one of the required main duties of her regular occupation, i.e. an insurance agent. Following this "regular occupation period", plaintiff would continue to collect disability benefits if she was totally disabled such that she could not perform each and every one of the main duties of any occupation. The Plan defines "any occupation" as "one that the Participant's training, education, or experience will reasonably allow." Plan, Art. II, § 2.1(ff)(ii).
In order to continue receiving benefits once the "regular occupation period" has ended, plaintiff was required to provide proof to defendant of continuing "total disability". Plan, Art. IV, §§ 4.1 and 4.2.
On June 13, 1991 plaintiff's treating physician, Dr. Sanan Saengsamran submitted an Attending Physician's Supplemental Statement on behalf of the plaintiff. He noted that plaintiff suffered from a nerve disorder and visual impairment, was totally disabled, and unable to work in her previous employment as an insurance agent or in any other work. Defendant's Exhibit A, pg. 138. He also noted that plaintiff was being counseled by a rehabilitation counselor from the Bureau of the Blind. In response to this doctor's statement, defendant hired Crawford & Co, a health and rehabilitation service, to perform a market analysis of jobs available to Ms. Davis given her medical limitations. On October 31, 1991 Crawford & Co. submitted its report indicating that, at that time, Ms. Davis was not capable of returning to her job as an insurance agent or performing any other work. Defendant's Exhibit A, pgs. *1305 125-28. Meanwhile, defendant contacted Dr. Saengsamran for more information regarding plaintiff's work with a rehabilitation counselor from the Bureau of the Blind. Defendant's Exhibit A, pgs. 120, 122-23. Defendant also contacted the National Federation of the Blind for information concerning services provided to the plaintiff. Defendant's Exhibit A, pgs. 117-19.
By letter dated March 26, 1992, the Missouri Department of Social Services informed defendant that some training had been provided to the plaintiff through Rehabilitation Services for the Blind. Defendant's Exhibit A, pg. 116. The letter states:
"Ms. Davis applied for services through Rehabilitation Services for the Blind and she was provided training in the areas of homemaking and mobility although the latter was extremely limited due to noncommital on the part of Ms. Davis. We went so far as to discuss employment options with her but she didn't feel she was ready. Her case was eventually closed in 1990 and we have had no contact with her since then."
On April 7, 1992 defendant contacted Crawford & Co. and requested a 1 Point Medical/Vocational Assessment regarding the plaintiff. Defendant's Exhibit A, pgs. 114-15.
On or about May 22, 1992 Crawford & Co. submitted its written assessment on the plaintiff. Defendant's Exhibit A, pgs. 108-113. This report indicated that plaintiff and her husband had acquired ownership of a cosmetology school in Arkansas. The report further notes that a personal interview with the plaintiff revealed that she had past cosmetology experience and was presently attempting to obtain her cosmetology license in Arkansas. Defendant's Exhibit A, pgs. 110-11. She indicated to the interviewer that she had already passed several portions of the Arkansas state boards. The report further notes that plaintiff had extensive experience not only as a cosmetologist and an insurance agent, but also as a office medical assistant in Dr. Saengsamran's office. The report concluded that given the plaintiff's past work history and the skills acquired, plus a strong motivation to return to the work force, plaintiff should be able to re-enter the work force. However, the report did note that such a re-entry could be "delayed" by the plaintiff's own fears and apprehensions concerning her limitations, and her reluctance to learn Braille. Defendant's Exhibit A, pgs. 110-11. After receiving this report, defendant requested further information from Crawford & Co. regarding the plaintiff's ownership of the cosmetology school and her pursuit of a cosmetology license in Arkansas. By letter dated August 7, 1992, Crawford & Co. reported that information received from the Arkansas Cosmetology Board Office indicated that plaintiff had passed the written portion of her exams in January 1992, but had failed to pass the demonstration portion of her exams on two occasions. It reported that plaintiff could continue attempting to pass the demonstration portion until January 1993, after which she would have to retake both the written and demonstration portions of the exam to obtain her Arkansas license. Defendant's Exhibit A, pgs. 97-99. The follow-up report also indicates that the investigator contacted the plaintiff several times by telephoning her at her and her husband's business, Dave's Classic Beauty School at 224 West Main, in Blythesville, Arkansas. The investigator states that plaintiff answered the phone each time he called the school and "[s]he implies she is at the school most days, even though she's unable to drive." Defendant's Exhibit A, pg. 98. The investigator further states "[s]he indicated she was very discouraged and frustrated with the Arkansas Cosmetology Board. She is of the opinion they have treated her unfavorably. She also noted for this reason, she will not attempt the test again in Arkansas." Finally, the investigator states that "[w]hen discussing Missouri State Boards, she indicated she has not attempted the tests, but was quick to verbalize a strong interest in attempting to receive her license through this state." Defendant's Exhibit A, pg. 98.
In response to this information, the defendant decided to continue the plaintiff's long-term disability benefits until the following April, at which time an activities check would be conducted. Defendant's Exhibit A, pg. 96.
*1306 On April 23, 1993 defendant requested Equifax Services, Inc. to do an activities check on the plaintiff. It specifically requested Equifax to "check to see what her daily activities are and if she appears to have any difficulty with her vision." Defendant's Exhibit A, pg. 92. On May 3, 1993 Equifax submitted a preliminary investigation report on the plaintiff. It reported that plaintiff was now living in Caruthersville, Mo. and that she, her husband, son, and daughter-in-law had recently purchased a tavern in Caruthersville. The report states that "[t]hey are active in operating the tavern. She goes to the tavern on a daily basis and spends her day with her husband." The report fails to detail the plaintiff's activities at the tavern because evidently plaintiff had not been at the tavern for several days due to the hospitalization of her husband in Memphis, Tennessee. Defendant's Exhibit A, pgs. 90-91. Following receipt of this report, defendant decided to direct Equifax to carry out a surveillance of the plaintiff in order to ascertain what activities she carried out on a daily basis, especially while at the tavern. On May 28, 1993 Equifax forwarded to defendant its report on a surveillance of the plaintiff carried out on May 21, 1995. In a letter accompanying the report, the investigator[2] states that he personally observed the plaintiff at her tavern. He states:
"Claimant was active during the afternoon of the surveillance and was observed constantly for the period of approximately 2½ hours. During the course of the surveillance, the claimants (sic) activities included operating a cash register and making change, waiting on customers, mixing drinks, and preparing food."
Defendant's Exhibit A, pg. 79. The report itself contains a detailed statement of plaintiff's activities at the tavern during the surveillance period[3], and details of conversations the investigator had with the plaintiff, her husband, their daughter-in-law, and various customers at the tavern. Defendant's Exhibit A, pgs. 80-84. The investigator also reports that the plaintiff was observed wearing green-colored contact lenses.
On June 29, 1993 the defendant requested updated medical information from plaintiff's attending physician, Dr. Saengsamran. Defendant's Exhibit A, pg. 77. Dr. Saengsamran returned medical reports to the defendant in response to that request. Defendant's Exhibit A, pgs. 72-76. However, defendant still needed an updated Attending Physician's Supplemental Statement form from Dr. Saengsamran. He submitted this form, dated July 29, 1993. On the form he noted that plaintiff was totally disabled for her job with the defendant as an insurance agent; however, she was not totally disabled for "any other work". He also states that plaintiff "can not see, she has help most of the time." Defendant's Exhibit A, pg. 68.
On August 26, 1993 Dr. Richard A. Orland, Medical Director for defendant and one of the members of the Disability Committee[4] wrote a memo to plaintiff's disability file. In this memo, he states:
"She [referring to the plaintiff] was awarded Social Security disability backdated to 1988, and has been adjudged to be disabled for any occupation.
Recent surveillance activities indicate otherwise. An LTD APS by Dr. Saengsamran, states that she is disabled for her own job but not for any other work. Also, a May 22, 1922 hypothetical evaluation stated that she has tranferrable skills and strong motivation and should be able to attain her goals."
Defendant's Exhibit A, pg. 64.
On September 7, 1993 the Disability Committee met to make determinations regarding the disability claims of various individuals, including Ms. Davis. The Committee voted to terminate her disability benefits because *1307 she was not considered totally disabled for any other work. Defendant's Exhibit A, pgs. 65-66. By letter dated September 8, 1993, Oakley Williams, Chairman of the Disability Committee communicated the Committee's decision to the plaintiff. The letter states, in pertinent part:
"After a thorough and complete review of all file materials, the Disability Committee has determined that you are not disabled from any occupation. Accordingly, benefits are not payable beyond September 1, 1993.
The Committee based its decision, in large part, upon the Attending Physicians Statement completed by Dr. Sanan Saengsamran on July 29, 1993. Specifically the Committee relied heavily upon Dr. Saengsamran's statement that you are not disabled for `Any Other Work'. The Committee also based its decision on a surveillance performed on you, which indicated that you are not totally disabled."
Defendant's Exhibit A, pg. 59.
Subsequent to informing Ms. Davis that her long-term benefits had been terminated, defendant received an undated letter from Dr. Saengsamran requesting a copy of the July 29th Attending Physicians Statement. Defendant's Exhibit A, pg. 56. In this letter, Dr. Saengsamran states "[t]here has been a mistake if this statement was made. Ms. Kathy Davis is blind and can not (sic) do any other work. She is totally disabled. We have two patients with the same name." Defendant's Exhibit A, pg. 56. On October 8, 1993 defendant sent Dr. Saengsamran a copy of his July 29th statement and vital statistics pertaining to the plaintiff. Dr. Saengsamran responded by letter dated October 22, 1993 stating only that "Kathy Davis is totally disabled because she is blind." Defendant's Exhibit A, pg. 54. This letter does not deny the accuracy of the July 29th statement, nor does it make any reference to plaintiff's ability to perform "any other work".
On November 4, 1993 defendant informed the plaintiff that Dr. Saengsamran had requested a copy of his July 29th statement, that it had been furnished to him, and what steps plaintiff should take if she wanted to appeal the Committee's decision. Defendant's Exhibit A, pg. 53. Meanwhile, by a letter dated October 26, 1993, plaintiff wrote Oakley Williams to complain about the termination of her benefits.[5] Defendant's Exhibit A, pgs. 50-52. Mr. Williams treated plaintiff's letter as a request for an administrative review of the Committee's denial decision pursuant to Art. VII, § 7.4 of the Plan. This provision provides for an appeal of the Committee's decision to the Plan Administrator, which according to the terms of the Plan, is the defendant. The administrative appeal provides for the Disability Committee to first review its initial decision and, if necessary, reverse its initial decision. If, however, the Committee stands by its initial decision, then the claim is brought to the attention of the Appeals Review Committee which is composed of officers of the defendant. Affidavit of Oakley Williams.
By letter dated November 12, 1993, defendant requested Dr. Saengsamran to clarify his position regarding the plaintiff's ability to do "any other work". Defendant's Exhibit A, pg. 48. Plaintiff was notified by defendant of this request. Defendant's Exhibit A, pg. 47. Dr. Saengsamran returned the November 12th letter to defendant with only the handwritten notation "Ms. Davis is disabled for any other work". Defendant's Exhibit A, pg. 45.
Ms. Davis' file was again circulated among the members of the Disability Committee. Affidavit of Oakley Williams. On December 21, 1993 the Committee met and decided to stand by its initial decision to terminate Ms. Davis' long-term disability benefits. Her appeal was then referred to the Appeals Review Committee. Defendant's Exhibit A, pgs. 40-41. On or about January 5, 1994 the Appeals Review Committee decided to deny plaintiff's appeal. This was communicated to her by letter dated January 6, 1994. Defendant's Exhibit A, pgs. 35-39. The letter simply states that after a "full review" of its prior decision terminating the long-term disability benefits, the decision was reaffirmed *1308 because plaintiff was not disabled for any occupation as stated in the Plan. Defendant's Exhibit A, pg. 35.
Plaintiff contends that this Court should conduct a de novo review of the defendant's denial of her long-term disability benefits. Specifically, she asserts that the defendant wrongfully terminated her benefits because 1) Dr. Saengsamran stated that she was totally disabled and could not perform "any other work"; 2) the decision to terminate her was made without the benefit of any vocational-education expert's opinion regarding whether plaintiff was capable, in light of her physical impairment, to perform any other occupation; 3) the surveillance report is full of inaccuracies regarding her activities at the tavern; and 4) defendant cannot rely on the Crawford & Co. reports to justify its denial of benefits because defendant failed to give plaintiff proper notice of such reliance in their letters of termination. Defendant counters that this Court should review the denial decision under the deferential "abuse of discretion" standard[6]. Under this standard, the Court should only review the material that was before the defendant at the time(s) the denial decision(s) were made; i.e. plaintiff's long-term disability file. Defendant contends that plaintiff's file provides ample evidence to support its decision, and that there was no need to obtain the opinion of a vocational-education expert (other than Crawford & Co.) before making its decision.
It is clear that a challenge to a denial of benefits under 29 U.S.C. § 1132(a)(1)(B) is reviewed under a de novo standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); Stock v. SHARE, 18 F.3d 1419, 1422 (8th Cir.1994); Collins v. Central States Health & Welfare Fund, 18 F.3d 556, 559 (8th Cir.1994); Farley v. Benefit Trust Life Ins., 979 F.2d 653 (8th Cir. 1992); Cox v. Mid-America Dairymen, Inc., 965 F.2d 569, 571 (8th Cir.1992); Finley v. Special Agents Mut. Ben. Assn., 957 F.2d 617, 619 (8th Cir.1992); Oldenburger v. Central States, S.E. & S.W. Areas Teamster Pension Fund, 934 F.2d 171, 173 (8th Cir. 1991).
In this case there is no dispute by the parties that the Plan clearly provides the Plan Administrator with discretionary authority to determine eligibility for benefits or to construe the terms of the Plan. Plaintiff, however, contends that this discretionary authority does not extend to the Disability Committee. The Court disagrees.
Defendant's Plan states:
The Disability Committee shall have the exclusive right to interpret any and all of the provisions of the Plan and to determine any questions arising thereunder or in connection with the administration of the Plan; provided, however, that in the determination of any question requiring the exercise of discretion by the Disability Committee, such determination shall apply in a uniform and nondiscriminatory manner to Participants similarly situated. Any decision or action of the Disability Committee shall be conclusive and binding upon all Participants.
Plan, Art. VII, § 7.3. The Eighth Circuit has consistently held that when a plan contains such language, a reviewing court must apply a "deferential standard of review". Collins, at 559; Cox v. Mid-America Dairymen, Inc., 13 F.3d 272, 275 (8th Cir.1994); Bolling v. Eli Lilly and Co., 990 F.2d 1028, 1029 (8th Cir.1993); Cox, 965 F.2d at 571. The deferential abuse of discretion standard must be applied both to the Disability Committee's interpretation of the Plan and to its fact-based disability determinations. See, Cox, 13 F.3d at 274; Bolling, at 1029; Cox, 965 F.2d at 571. Because "courts are hesitant to interfere with the administration of a pension plan", Cox, 13 F.3d at 274 quoting Bueneman v. Central States Southeast & Southwest Areas Pension, 572 F.2d 1208, 1209 (8th Cir.1978), this Court should affirm "a reasonable interpretation of a plan", Finley, at 621.
*1309 The Court has carefully reviewed the evidence that was before the Disability Committee when it made its initial decision and reaffirmed its decision on appeal.[7] Under the Plan, plaintiff was eligible for long-term disability benefits as long as she remained "totally disabled"; i.e. unable to do each and every one of the main duties of any occupation. Plan, Art. II, § 2.1(ff)(ii). "Any occupation" is defined as one that "the Participant's training, education, or experience will reasonably allow." Plan, Art. II, § 2.1(ff)(ii). In order to decide whether the Disability Committee abused its discretion by denying coverage for the plaintiff under this standard, this Court must consider the evidence supporting the Committee's determination, at the time the determination was made.
The Committee had before it a substantial amount of information regarding the status of plaintiff's disability. In 1990, plaintiff's treating ophthalmologist, Dr. W. Howard Lewin, testified at a deposition that his last exam of plaintiff, in 1988, showed that she had long-standing optic atrophy in her right eye (presumably from a childhood injury or defect) and a very limited visual field in her left eye. Although her pupils reacted to various tests, she reported virtually no vision to Dr. Lewin. He concluded that she was "legally blind" but could not give a definitive opinion as to whether or not she was "malingering" because of the substantiated loss of vision in her right eye. As to Dr. Sanan Saengsamran's medical assessments, the Court finds that his assessments were inconsistent. He clearly indicated on his July 29, 1992 statement that although he considered the plaintiff blind and unable to perform her job as an insurance agent for the defendant, he did not consider her totally disabled in so far as not being able to perform any other work. His letters thereafter do not admit that his July 29th statement was made in error. He only attempted to modify his opinion after the plaintiff contacted him following defendant's termination of her benefits. Given these circumstances, it was reasonable for the Committee to discount Dr. Saengsamran's post-July 29, 1992 statements. Crawford & Co.'s reports showed that plaintiff had been actively pursuing other career options, namely cosmetology and tavern owner. Its vocational assessment, based upon interviews with her and analysis of her work history, was generally a positive one for her. The reports showed that her visual impairment was not a complete obstacle to her re-entering the work force. Finally, the surveillance showed that plaintiff was actively engaged in the daily operations of her tavern and carrying out activities which indicated that her visual limitations were not totally disabling under the terms of the Plan.
Plaintiff contends that since the letters denying her long-term benefits did not specifically reference the Crawford & Co. reports, defendant is precluded from using them as supporting evidence for its decision. She further contends that the defendant was required to obtain a vocational-education expert's opinion that plaintiff was presently capable, in light of her visual impairment, to perform the main duties of any occupation. She cites the case of Gunderson v. W.R. Grace Long Term Dis. Income Plan, 874 F.2d 496, 499 (8th Cir.1989) for this proposition.
The existence of the Crawford & Co. reports is no surprise to the plaintiff. They have always been contained in her disability file. Her discussions with the Crawford & Co. investigators are part of these reports. While it is true the letters of denial do not specifically reference these reports, the letters do inform the plaintiff that her entire file, which included these reports, was considered in making the determination to stop her benefits. Various memorandums to her file highlight the Crawford & Co. vocational assessment reports. See, Plaintiff's Exhibit 64 (memo dated August 26, 1993 by Dr. Richard Orland), Exhibit 44 (memo dated December 6, 1993 by Dr. Richard Orland). Plaintiff was told by defendant, via a telephone conversation, that the decision to terminate her benefits rested primarily on Dr. *1310 Saengsamran's July 29, 1992 statement and the surveillance report, but also was supported by the Crawford & Co. vocational assessment reports. Plaintiff's Exhibit 34. The letters of denial, coupled with the correspondence and memoranda in plaintiff's disability file, sufficiently set out the defendant's rationale for its decision to terminate her benefits. Plaintiff had all the information she required to adequately prepare her appeal to defendant's appeal review committee and to this Court. Collins, at 561.
Even if the Crawford & Co. vocational assessment reports are eliminated as supporting evidence for the defendant's decision, sufficient evidence exists to support the defendant's decision as a reasonable decision. Plaintiff believes that the defendant was required to obtain the opinion of a vocational expert as to plaintiff's present capabilities, given her limited vision, before deciding that she was able to perform the main duties of "any other work" besides the work she had previously done for defendant. She cites the case of Gunderson v. W.R. Grace Long Term Dis. Income Plan, supra. in support of her argument.
The Court has carefully reviewed the Gunderson case, and finds it inapplicable to the case at hand. In Gunderson, the defendant plan determined that the plaintiff was not "totally disabled" and thus, unable "to engage in any and every duty pertaining to any occupation or employment" for which the plaintiff was or had become "reasonably qualified by training, education, or experience", based solely upon his doctors' opinions that he was totally disabled from performing his job, but might be able to perform other work given retraining. Gunderson, at 499. The Eighth Circuit held that since the doctors were not qualified to give an opinion regarding what rehabilitation or vocational training plaintiff required in order to reenter the work force in "any occupation", the defendant plan should have obtained the opinion of a qualified vocational expert before rendering its decision. Gunderson, at 499.
However, in a subsequent case, the Eighth Circuit clearly restricted the holding of Gunderson to its limited facts. In Potter v. Connecticut General Life Ins. Co., 901 F.2d 685 (8th Cir.1990), the Court held that a plan administrator's decision to terminate long-term disability benefits was reasonable despite the absence of any testimony by a vocational expert as to the type of work that the plaintiff might be able to perform. The Court found that the medical evidence, a surveillance video-tape of the plaintiff engaging in daily activities, evidence of plaintiff actively engaging in the operation of his wife's entertainment business, and the denial of social security benefits to the plaintiff was sufficient evidence to support the plan administrator's decision and the district court's affirmance of same. Id., at 687.
Other circuits have dismissed the importance of the Gunderson case. These courts have limited Gunderson to its facts, i.e. insurance company defendant using a plaintiff's doctor's report qualifying the plaintiff for disability from own occupation to support defendant's contention that the plaintiff was not disabled from doing other work. More importantly, these courts have found that the "any occupation" standard is not demanding and does not require the plan administrator to ensure the availability of an alternative job before terminating benefits. McKenzie v. General Telephone Co. of California, 41 F.3d 1310, 1316-18 (9th Cir.1994); Duhon v. Texaco, 15 F.3d 1302, 1308-09 (5th Cir.1994); Block v. Pitney Bowes, 952 F.2d 1450, 1455 (D.C.Cir.1992); Goldammer v. Aid Ass'n for Lutherans, 747 F.Supp. 1366, 1368-69 (D.S.D.1990). This Court concurs "that consideration of vocational evidence is unnecessary where the evidence in the administrative record supports the conclusion that the claimant does not have an impairment which would prevent him from performing some identifiable job. The plan administrator is not required in every case where the `any occupation' standard is applicable to collect vocational evidence in order to prove there are available occupations for the claimant." McKenzie, at 1317 (referencing the Duhon and Block cases).
In the instant case, the plan administrator/disability committee had before it the deposition of plaintiff's ophthalmologist, the Crawford & Co. vocational assessment reports, information from the Rehabilitation *1311 Services for the Blind regarding rehabilitation services provided to the plaintiff, information from the Arkansas Board of Cosmetology regarding plaintiff's board exams, Dr. Saengsamran's July 29, 1992 physician's statement, and the surveillance report regarding plaintiff actively engaging in the operation of her family's tavern business. Although the record also contains Dr. Saengsamran's limited retraction of his July 29, 1990 physician's statement, this Court cannot conclude that it was an abuse of discretion for the defendant to discount these limited attempts to retract his statement given the fact that these retractions were submitted following denial of the benefits. Furthermore, although the plaintiff now seeks to contradict the observations noted in the surveillance report, she failed to provide the defendant, during her administrative appeal, with any information contradicting the surveillance report. Finally, the fact that the plaintiff had been awarded social security benefits for "total disability" is not conclusive evidence binding upon the defendant since eligibility for benefits under the Social Security Act differs from eligibility for benefits under the Plan. See, Cox, 965 F.2d at 572-73.
"Congress intended plan fiduciaries, not the federal courts, to have primary responsibility for claims processing." Duhon, at 1309 quoting Makar v. Health Care Corp., 872 F.2d 80, 83 (4th Cir.1989). Since the primary decision regarding entitlement to benefits is made by the plan administrator, claimants should present their strongest case before the plan administrator, not the federal court. Duhon, at 1309. "Congress' apparent intent in mandating these internal claims procedures was to minimize the number of frivolous ERISA lawsuits; promote the consistent treatment of benefit claims; provide a nonadversarial dispute resolution process; and decrease the cost and time of claims settlement." Duhon, at 1309 quoting Makar, at 83. In the instant case, plaintiff provided nothing more than her doctor's two letters attempting to retract his July 29, 1992 physician's statement as support for her claim. Defendant did not abuse its discretion merely because of these two letters. When the plaintiff's entire disability file is viewed deferentially, this Court cannot say that the defendant's decision to terminate the plaintiff's long-term disability benefits was unreasonable. See, Bolling, supra.
In light of the afore-referenced reasons, plaintiff's motion for summary judgment will be denied and defendant's motion for summary judgment will be granted.
NOTES
[1] Both parties have submitted the plaintiff's disability file which contains a copy of the defendant's long-term disability plan, as well as all documents pertaining to the plaintiff's total disability claim. For purposes of judicial efficiency and clarity, the Court will refer to one exhibit or the other, but not both.
[2] Equifax' investigators are known as "surveillance specialists".
[3] The Court is aware that the plaintiff is challenging the "accuracy" of the investigator's report; however, the Court is only setting forth what is contained in the report without any regard to the "accuracy" of the report.
[4] The Disability Committee is a five-member committee which administers the daily operations of the Plan and makes claims determinations with respect to the Plan.
[5] There is a notation on this letter that it was received November 11, 1993; evidently, after the letter of November 4, 1993 had been sent to the plaintiff.
[6] The deferential "abuse of discretion" standard for review of denial of benefits in an ERISA case is also known as the "arbitrary and capricious" standard.
[7] Under the deferential abuse of discretion standard, a reviewing court reviews the actions of the plan fiduciaries (such as the Disability Committee) based upon the evidence that was before them. Cox, 965 F.2d at 573, n. 4; Oldenburger, at 174.