978 F.Supp. 892 (1997)
Donald E. CONLEY, Plaintiff,
v.
PITNEY BOWES, INC., Pitney Bowes Long Term Disability Plan, George B. Harvey, Carmine F. Adimando, and Allan A. Crystal, as Trustees of Pitney Bowes Long Term Disability Plan, Defendants,
and
Pitney Bowes Group Life Insurance Plan, Pitney Bowes Retirement Plan, Pitney Bowes Major Medical Expense Plan and Pitney Bowes Dental Expense Plan, Defendant Parties-in-Interest.
No. 1:92CV25-DJS.
United States District Court, E.D. Missouri, Southeastern Division.
July 30, 1997.
Order Denying Stay October 6, 1997.
*893 S. Sheldon Weinhaus, Weinhaus and Dobson, St. Louis, MO, for Plaintiff.
Clark H. Cole, Keith A. Rabenberg, Armstrong and Teasdale, St. Louis, MO, for Defendants.

MEMORANDUM OPINION
STOHR, District Judge.
Plaintiff brings the instant action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. As indicated in its order of January 24, 1997, the Court construes the second amended complaint as asserting, in Count I, a claim for benefits under the defendant Long Term Disability Plan ("the Plan") pursuant to 29 U.S.C. § 1132(a)(1)(B), and in Count III, a claim of interference with protected rights pursuant to § 1140. The breach of fiduciary duty claim asserted in Count II has been dismissed for failure to state a claim upon which relief might be granted. See Order and Partial Dismissal dated January 24, 1997.
*894 The remaining claims were tried to the Court sitting without a jury on February 4, 5 and 6, 1997. Having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, the Court here sets forth its findings of relevant fact and conclusions of law, in accordance with Fed.R.Civ.P. 52(a).

Findings of Fact
1. In September 1989, plaintiff lived in Poplar Bluff, Missouri, and worked for defendant Pitney Bowes, Inc. ("Pitney Bowes") as a customer service representative who sold and serviced business machines over a five-county area.
2. Plaintiff was then covered by the defendant Long Term Disability Plan, an ERISA-governed employee benefit plan sponsored and administered by Pitney Bowes.
3. At all times relevant to this action, the medical staff of the Disability Department which handled plaintiff's claim for disability benefits under the Plan consisted of a Dr. Julian Levine, Medical Director, and Jane Millar, a registered nurse.
4. Helene Gardner served as "Long Term Disability Administrator" or "LTD Administrator." The summary of Pitney Bowes' various employee benefit plans lists Pitney Bowes, Inc. as the plan administrator as that term is used in the Plan itself.
5. Dr. Levine and Ms. Millar reviewed medical information submitted pertinent to disability claims, and made initial determinations of eligibility for benefits, subject to appeal to the Employee Benefits Committee.
6. On September 26, 1989, while driving to a service call, plaintiff's automobile was rear-ended by another car.
7. Afterward plaintiff drove himself to a clinic or hospital in Poplar Bluff, where x-rays were taken and pain medication was given.
8. Plaintiff saw his personal physician, Dr. Elliott, several days after the accident on September 29, 1989. On that date, Dr. Elliott completed a Pitney Bowes form entitled "Attending Physician's Statement of Disability" indicating a diagnosis of back and cervical degenerative joint disease with acute strain, and that plaintiff was temporarily disabled for all types of work. Dr. Elliott ordered x-rays to be taken and referred plaintiff to physical therapy.
9. At a later visit, Dr. Elliott referred plaintiff to a neurosurgeon from Memphis, Tennessee, a Dr. Donahue.
10. Dr. Donahue deemed the results of an MRI (magnetic resonance imaging) not to explain or support the subjective symptoms reported by plaintiff, and ordered a myelogram, a more invasive test involving the injection of dye into the areas surrounding the spinal column. Plaintiff cancelled the myelogram, because he was unwilling to undertake the drive to and from Memphis and because in his past experience a myelogram had caused a severe headache.
11. Plaintiff's prior medical history included a spinal fusion in the mid-1970's and a laminectomy, from which plaintiff claims to have made a complete recovery.
12. Jan Thompson, a registered nurse employed by ConServCo, met with plaintiff and his wife on November 22, 1989, after plaintiff's workers' compensation file was referred to ConServCo, a disability and medical cost management service, by Travelers Insurance Company, Pitney Bowes' workers' compensation carrier.
13. Jane Millar of the Disability Department maintained regular contact with Jan Thompson at ConServCo, and thereby obtained medical reports and other information provided to Thompson. This information was relied upon by the Plan in making its determination that plaintiff was not totally disabled.
14. Unless otherwise noted herein, the medical information and reports described or referred to in these findings were part of the Disability Department file and were considered in the making of the Plan's determination of plaintiff's claim.
15. Thompson's report of the November 22, 1989 meeting notes that plaintiff's personal physician, Dr. Elliott, had referred plaintiff to Dr. Donahue, and that Dr. Donahue *895 had performed an MRI and recommended an outpatient myelogram, which plaintiff declined on the ground that he could not tolerate the 4½ hour return car trip from Memphis afterward.
16. Thompson's November 22, 1989 report also describes Dr. Elliott's treatment of plaintiff, including physical therapy, Anaprox, Vitamin B-6 and Vicodin as necessary for pain.
17. At that time, Thompson scheduled an appointment for plaintiff with a Dr. Adams on December 19, 1989, for a second opinion concerning plaintiff's injury and condition.
18. Upon Dr. Adams' recommendation, plaintiff did undergo a myelogram and CT scan, the results of which suggested to Dr. Adams as of January 5, 1990 that plaintiff might have a herniated disc or problems relating to scar tissue from his previous back surgery, and that surgery  decompression and discectomy  might ultimately be warranted if further physical therapy did not result in improvement.
19. At a later visit on January 29, 1990, Dr. Adams' recommended and discussed surgery with plaintiff.
20. Relative to his workers' compensation claim, ConServCo referred plaintiff to a neurologist, Daniel Phillips, M.D., for evaluation. Dr. Phillips' initial written report to ConServCo, dated February 26, 1990, indicated a largely normal examination and no objective medical findings consistent with plaintiff's reports of pain.
21. On March 8, 1990, after reviewing a myelogram and CT scan of plaintiff, Dr. Phillips noted a significant disc bulge, though not a herniated disc, and generally concurred with Dr. Adams' recommendation that surgery be considered, although he observed that the disc problem would not, account for all of plaintiff's complaints, such as urinary urgency, difficulty maintaining an erection, and interscapular symptoms.
22. Dr. Phillips sent Jan Thompson a letter dated March 19, 1990 summarizing his findings after completion of an EMG (electromyogram) and nerve conduction study on plaintiff on March 16. Dr. Phillips reported chronic changes related to plaintiff's old surgery and no significant findings relevant to plaintiff's complaints of pain.
23. By telephone on March 20, 1990, Jan Thompson related to Jane Millar that Dr. Phillips believed surgery was a reasonable option, that plaintiff was considering obtaining a second opinion, and that if plaintiff ultimately elected not to have surgery then his disability for workers' compensation purposes would be rated on a percentage basis.
24. By letter to Jan Thompson of ConServCo dated April 18, 1990, Dr. Phillips stated his rating of plaintiff as having a cumulative 8% partial permanent disability of the whole person.
25. By that time, plaintiff had indicated his election not to have the surgery which Drs. Adams and Phillips had indicated as an option, based on his concerns about its likelihood of success and the possibility of not being able to walk or control his bodily functions, including sexual function and elimination.
26. Plaintiff's personal physician, Dr. Elliott, wrote a letter/report dated April 23, 1990 summarizing his view of plaintiff's condition, including, his opinion that plaintiff was unable to resume his prior duties at that time and plaintiff's limited ability to perform any work. Dr. Elliott drafted the letter at plaintiff's request. The record does not support a finding that the letter was ever submitted to the Disability Department or was in the file upon which the Plan's disability determination was made.
27. In July 1990, plaintiff had himself examined by Dr. John Kenney, an Assistant Professor of Orthopedic Surgery at the St. Louis University School of Medicine. Dr. Kenney's findings are set out in a letter dated August 3, 1990 to plaintiff's then-counsel, indicating that Dr. Kenney, after reviewing the x-rays, myelogram and CT scan previously performed, was unable to detect a herniated disc and saw no need for any surgical intervention or other additional treatment. Dr. Kenney's findings, which in any event did not support a finding of total disability, were never submitted to the Disability Department and were not part of its file at *896 the time of the Plan's disability determination.
28. On September 24, 1990, Dr. Elliott completed a form entitled "Medical Assessment of Ability to Do Work-Related Activities (Physical)," which was provided to him through the mail or by plaintiff. On the form, Dr. Elliott records his view as to plaintiff's ability to perform various activities, such as sitting, lifting, carrying and others. The record does not support a finding that the form was ever submitted to the Disability Department or was in the file upon which the Plan's disability determination was made.
29. A November 9, 1990 letter by a Travelers claims representative states that at plaintiff's request, Travelers agreed to have an MRI of the thoracic spine performed, to be reviewed by Dr. Phillips. The letter further states that Dr. Phillips found the MRI to indicate only minimal degenerative changes, on the basis of which Dr. Phillips informed plaintiff that nothing more could be done medically to treat his subjective complaints of pain.
30. By letter dated February 16, 1990, from Helene Gardner, plaintiff was informed that his short-term disability benefits would cease "at the end of the 22nd week, February 28, 1990," but that his worker's compensation payments would continue so long as Travelers Insurance Company, Pitney Bowes' workers' compensation carrier, continued to approve plaintiff's classification as disabled.
31. Plaintiff was on long term disability status for one year from March 1, 1990 through February 28, 1991, but received no benefits directly attributable to that status for the reason that his workers' compensation and/or Social Security disability benefits were sufficient to off-set the long term disability benefit to which he would have been entitled.
32. Plaintiff's claim of disability is predicated on his complaints of neck, back and leg pain resulting from the September 1989 auto accident.
33. Plaintiff has never been hospitalized following the September 1989 auto accident, has had no surgeries, and has not undergone any treatment by a pain clinic.
34. Plaintiff has not worked since the date of the accident.
35. On October 26, 1990, a decision favorable to plaintiff was issued on his appeal of the denial of Social Security disability benefits; the decision found plaintiff entitled to a period of disability commencing September 26, 1989 and to disability insurance benefits under the Social Security Act.
36. Plaintiff reported to the Disability Department that he had been awarded Social Security disability benefits, and the department was aware of the appeals ruling in plaintiff's favor at least as early as March 15, 1991.
37. By letter dated April 10, 1991, signed by Helene Gardner as LTD Administrator, Pitney Bowes advised plaintiff that his request for long term disability benefits was denied based on the determination that he was not "totally disabled" as defined in Article 2.20 of the Plan. The letter makes specific reference to Dr. Phillips' 8% partial permanent disability rating as one factor upon which the Plan relied in making its determination.
38. Dr. Levine was the decisionmaker responsible for the denial of plaintiff's long term disability claim on April 10, 1991.
39. Millar credibly testified that plaintiff's subjective complaints of pain appeared unsupported by the objective medical findings documented in his file, and that plaintiff's skills appeared to be transferrable to other jobs which would not have had the same physical demands as his prior work as a traveling service representative. The Court finds that these conclusions constituted the basis for the denial of plaintiff's claim for long term disability benefits by the Plan.
40. The Disability Department's file on plaintiff erroneously contained a number of records relating to a different individual, a Donald G. Conley, and largely concerning his blood pressure. How and when these materials were placed in the file is not established. Millar credibly testified that these records would not have been taken into account in the consideration of plaintiff's disability claim, because their contents were *897 unrelated to the nature of plaintiff's claimed disability and because examination of the records would have indicated that they were not pertinent to plaintiff.
41. On November 27, 1989, C. Leonard Jones, then Pitney Bowes' Director of Personnel for the Southwestern Division, inquired by telephone of Jane Millar concerning the expected duration of plaintiff's absence from the job.
42. Jones' telephone call was followed by a November 30, 1989 memorandum to Millar requesting that she provide him with any additional information bearing on plaintiff's return to work date before December 8, 1989, when a decision was expected to be made concerning reassignment of plaintiff's territory.
43. Plaintiff had been the sole customer service representative assigned to his territory, and his continued absence raised an issue of coverage for Pitney Bowes' customers in his territory.
44. Over the ensuing months, Jones had continuing contacts with the Disability Department concerning plaintiff's employment status.
45. Jones eventually became aware that plaintiff's territory had been reassigned. In conversations with plaintiff, Jones inquired about plaintiff's ability to relocate if necessary for another position with Pitney Bowes, if plaintiff eventually became able to return to work. Plaintiff informed Jones that he was not able to relocate.
46. The April 10, 1991 letter plaintiff received, stating that his long term disability benefits claim was denied suggested that plaintiff contact Jones concerning his employment status. Plaintiff did not do so.
47. Plaintiff having been denied long term disability benefits, but not having reported back to work, his employment status was unclear. Leonard Jones sent plaintiff a letter dated July 3, 1991 requesting that plaintiff contact him to indicate his determination whether to take a personal leave of absence or terminate his employment.
48. Plaintiff turned the letter over to an attorney, John Bloodworth, who sent Jones a response rejecting both of the options presented in Jones' letter and representing that plaintiff planned to return to work as soon as physically able. The letter also indicated plaintiff's intention to file suit concerning the denial of long term disability benefits.
49. Bloodworth's letter was dated July 12, 1991. At that time, plaintiff did not genuinely anticipate any substantial improvement in his condition, and later that month, plaintiff and his wife moved some 275 miles from Poplar Bluff, Missouri to the Murfreesboro, Tennessee area.
50. Jones referred Bloodworth's letter to Pitney Bowes' legal department, and awaited advice from that department concerning plaintiff's status.
51. Almost one year later, on June 1, 1992, Jones sent plaintiff a letter announcing plaintiff's immediate termination and describing plaintiff's severance benefits.
52. The determination to terminate plaintiff's employment was made by Jones after consultation with Pitney Bowes' legal department. Pitney Bowes terminated plaintiff because he was not on long term disability status, had not requested a leave of absence, and had not reported for work since the September 1989 accident.

Conclusions of Law

I. Count I  Claim for Benefits

Article Two, § 2.20 of the Plan defines total disability as follows:

Totally Disabled or Total Disability shall mean that the Participant is unable to perform his own occupation for a maximum period of twelve (12) months after the Qualifying Period and that thereafter he is unable, because of injury or illness, to engage in any gainful occupation or profession for which he is, or could become, reasonably suited by education, experience, or training, unless he is actively participating in an approved Rehabilitative Employment Program, as determined by the Employee Benefits Committee.
Plaintiff was denied benefits after the initial twelve month period, at which time his claim was subject to the more stringent "any gainful occupation" standard. By memorandum *898 and order of July 5, 1996, the Honorable Stephen N. Limbaugh, the United States District Judge then presiding over this action, determined that Count I is subject to review under an abuse of discretion standard because § 7.6 of the Plan grants explicit discretionary authority to the Employee Benefits Committee to interpret and construe the Plan and determine all questions of eligibility and status of plan participants. See Firestone Tire and Rubber v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956-57, 103 L.Ed.2d 80 (1989); Donaho v. FMC Corporation, 74 F.3d 894, 898 (8th Cir.1996).
The Eighth Circuit's most frequent formulation of the abuse of discretion standard has been that the decision be "supported by substantial evidence" and "reasonable." Donaho, 74 F.3d at 899. "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at n. 10. The decision need not be the only sensible one, so long as it is supported by a reasoned explanation, based on the evidence, even if there exists a different outcome which is also reasonable. Id. at 899. The unreasonableness of a plan decision can be determined both by the quantity and the quality of the evidence upon which it is based, however, so that if either is insufficient, the decision may be deemed insupportable. Id. at 900.
Furthermore, a less deferential standard of review may apply "if the beneficiary shows that a serious procedural irregularity existed which caused a serious breach of the administrator's duty to the plan beneficiary." Wald v. Southwestern Bell Corp. Customcare Medical Plan, 83 F.3d 1002, 1007 (8th Cir.1996), citing Buttram v. Central States, 76 F.3d 896, 900 (8th Cir.1996). "The deferential standard will apply, however, unless the beneficiary comes forward with evidence establishing that the administrator acted under a conflict of interest, dishonestly, with an improper motive, or without using judgment." Wald, 83 F.3d at 1007. Examples include "where the plan trustee does not inquire into the relevant circumstances at issue; where the trustee never offers a written decision, so that the applicant and the court cannot properly review the basis for the decision; or where procedural irregularities are so egregious that the court has a total lack of faith in the integrity of the decision making process." Buttram, 76 F.3d at 900. In such circumstances, "a court may infer that the trustee did not exercise judgment when rendering the decision." Id. Buttram emphasizes, however, that "it is not the existence of procedural irregularities per se that will cause a court to employ a heightened standard of review;" in addition, "those irregularities must have some connection to the substantive decision reached." Id. at 901.
Plaintiff urges the existence of procedural irregularities amounting to breach of fiduciary duty warranting the application of this less deferential standard of review.[1] The Court notes, however, that the consideration of evidence beyond that presented to the Plan decisionmaker is not automatic even under de novo review. To the contrary, in Donatelli v. Home Ins. Co., 992 F.2d 763, 765 (8th Cir.1993), the Eighth Circuit, citing with approval the carefully considered conclusion of the Fourth Circuit en banc in Quesinberry v. Life Ins. Co. of North America, 987 F.2d 1017, 1021-27 (4th Cir.1993), has held that even in a case of de novo review, the district court should not permit and consider an expanded factual record in the absence of good cause to do so. In Quesinberry, 987 F.2d at 1025, the Fourth Circuit stated that "[i]n most cases, where additional evidence is not necessary for adequate review of the benefits decision, the district court should only look at the evidence that was before the plan administrator or trustee at the time of the determination."
The Court finds largely unpersuasive plaintiff's assertions of serious procedural irregularity or breach of fiduciary duty in the administration of the Plan. Specifically, the Court rejects plaintiff's contentions concerning reliance upon the 8% disability rating, the alleged partiality of Dr. Phillips, inadequacy *899 or non-existence of an administrative record for decision, inclusion in plaintiff's file of records pertaining to Donald G. Conley, and reliance on information developed in connection with plaintiff's workers' compensation claim[2] as constituting procedural irregularities and breaches of fiduciary duty meriting application of a heightened standard of review.
The Court also rejects as without merit plaintiff's contention that the Plan and its administrators were required specifically to invite or instruct plaintiff to submit information and evidence in support of his claim for benefits. Section 5.2 of Article Five of the Plan provides in pertinent part as follows:

Proof of Disability  A Participant shall be required to submit whatever proof the Company may require (either directly to itself or to an independent disability case review organization retained for this purpose), including the statements of one or more duly-qualified physicians, initially and from time to time, as evidence of his Total Disability and of the continuation of such Total Disability[.]
The Court does not interpret this provision as imposing a duty upon the administrator to articulate to the claimant specific requirements of proof. To the contrary, the provision may more reasonably be interpreted as imposing upon plaintiff a duty to submit to the Plan the statements of one or more physicians, both initially and from time to time, as well as any other information he deems appropriate or which the Plan may specifically require of him.
The most persuasive of plaintiff's allegations of irregularity concern the delegation of disability determinations under the Plan and the inadequacy of the denial notice. Nurse Jane Millar testified that the responsibility for claims handling was delegated by the Employee Benefits Committee to the Disability Department, and that she and Dr. Levine were responsible for reviewing medical information submitted relevant to a claim and for making recommendations or determinations as to eligibility for benefits. The deposition testimony of Michael Critelli, a former member of the Employee Benefits Committee, is also consistent with such delegation of authority as to the initial determination of disability benefits under the Plan.
Article Seven, § 7.1 invests in an Employee Benefits Committee the "general administration of the Plan and the responsibility for carrying out the provisions thereof." Section 7.4 grants the Employee Benefits Committee "final, conclusive, and binding" authority to make determinations and take action "with respect to any question arising out of or in connection with the administration of the Plan." The specific powers and duties of the Employee Benefits Committee are set forth in § 7.6, including in § 7.6(c) the power to interpret and construe the Plan, to determine questions of eligibility and of the status and rights of Participants. Section 7.6(e) authorizes the Employee Benefits Committee to delegate to an Administrative Committee "such powers and duties (other than those set forth in (a), (b), (c) and (d) above) to enable it to administer the Plan." This language appears, then, to make the responsibility to make benefits determinations set forth § 7.6(c) non-delegable.[3] The apparent delegation of benefits determination authority to the Medical Director appears, then, to violate the terms of the Plan.
On the record evidence, the Court has found that Dr. Levine is the decisionmaker who determined that plaintiff was not disabled within the meaning of the "any gainful occupation" standard of § 2.20 of the Plan. The record does not contain any written recommendation or determination by Dr. Levine or the Employee Benefits Committee as to plaintiff's disability claim, other than the denial letter dated April 10, 1990 written by Helene Gardner, presumably at Dr. Levine's *900 direction. Neither does the record include a written explanation of the rationale for Dr. Levine's decision that plaintiff was not totally disabled within the meaning of the Plan. "The Eighth Circuit has read the statute and the regulations to require the administrator to `set out in opinion form the rationale supporting their decision.'" Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 693 (7th Cir. 1992), quoting Richardson v. Central States, 645 F.2d 660, 665 (8th Cir.1981). These procedural irregularities may be of sufficient seriousness to undermine faith in the integrity of the decision making process within the meaning of Wald and Buttram, although the Court is not, even in view of these facts, "left with a firm conviction that the denial of benefits was the result of an arbitrary decision or whim." Buttram, 76 F.3d at 901.
Upon careful consideration, however, the Court has concluded that in the circumstances of this case, a final determination of such matters as govern the standard of review is not necessary for the reason that under any of the potentially applicable standards outlined above, the Court would uphold the determination that plaintiff is not entitled to benefits under the Plan. The information upon which the Court has found that Dr. Levine based his determination provides substantial and reasonable support for his decision, in that the reports of the several physicians who examined plaintiff suggested the lack of an objective medical basis for plaintiff's subjective complaints of pain, particularly where the pain was alleged to correspond with the September 1989 car accident and the scant objective medical evidence indicated only chronic degenerative conditions associated with plaintiff's preexisting back problems and surgery. Adjudged on an abuse of discretion standard, then, the disability determination would be affirmed.
Were the Court to apply a de novo standard of review, but limit its consideration to the same evidence as was present in plaintiff's Disability Department file at the time of Dr. Levine's decision, the Court's own judgment would be the same, namely that plaintiff's claimed disability lacked credible supporting medical findings. Because the Court's own determination would be that plaintiff's claimed injury lacked credibility, the Court would also conclude that it did not render plaintiff incapable of any gainful employment, as required for total disability under the pertinent Plan provisions.[4]
This same conclusion would only be further bolstered were the Court to consider the evidence offered by both parties beyond that which was part of the administrative record. For example, the Court finds persuasive in this regard the fact that the findings of Dr. Kenney, the orthopedic surgeon independently consulted by plaintiff, yielded no need for any surgery or other additional treatment.[5] Also highly persuasive in the Court's view is the deposition testimony of Dr. Phillips indicating his suspicions that plaintiff's complaints were exaggerated or unreliable.
For all the foregoing reasons, then, and based on the Court's findings of relevant fact, the Court concludes that the denial of plaintiff's claim for long term disability benefits should be upheld and affirmed. Judgment in favor of defendants will be entered on Count I of the second amended complaint.

II. Count III  Interference with Protected Rights

Section 510 of ERISA, 29 U.S.C. § 1140, prohibits the discharge of an employee/plan participant "for exercising any right to which *901 he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." The remaining Count III of the second amended complaint alleges that Pitney Bowes' termination of plaintiff's employment violated § 1140. The Eighth Circuit has held that such claims be analyzed under the familiar framework applicable to claims of employment discrimination under Title VII and the ADEA:
If the claimant is able to establish a prima facie case of a violation of § 510, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. If the employer does so, the burden shifts back to the claimant to prove that the proffered reason is pretextual.
Kinkead v. Southwestern Bell Telephone Company, 49 F.3d 454, 456 (8th Cir.1995).
On the facts found by the Court, plaintiff's claim of interference with protected rights fails both because plaintiff has not made out a prima facie case and because plaintiff does not succeed in carrying his ultimate burden of persuading the Court that his termination was motivated by considerations prohibited by § 1140 rather than by the legitimate, lawful reasons found by the Court.
[T]o establish a prima facie case of deliberate interference with prospective benefits under § 510, a claimant must demonstrate a causal connection between the likelihood of future benefits and an adverse employment action ... [Section] 510 of ERISA does not prohibit firing an employee who becomes less productive because of an illness or disability.
Id. at 457.
Plaintiff has presented no persuasive evidence that Pitney Bowes terminated him in order to deprive him of benefits under any of the ERISA plans applicable to him during his employment. Instead, the Court has found that Pitney Bowes terminated plaintiff, more than one year after justifiably denying plaintiff's claim for long term disability benefits, because plaintiff failed to return to work or to arrange any other acceptable alternative employment status, such as a leave of absence. His claim for disability status having been rejected, plaintiff was not entitled to remain indefinitely on the payroll despite his failure to return to work, so as to be eligible for other ERISA plan coverages available to Pitney Bowes' employees. On these facts, the Court finds no violation of § 1140, and will enter judgment in favor of defendants on Count III of the second amended complaint.

Conclusion
Accordingly, for all the reasons set forth above, the Court finds in favor of defendants and against plaintiff on the two remaining claims of plaintiff's second amended complaint, seeking review of the denial of long term disability benefits and alleging a termination constituting unlawful interference with ERISA-protected rights. A separate judgment reflecting this disposition will be entered herein this day. Defendants' potential entitlement to attorney's fees and costs will not be considered at this time, but is subject to consideration in the event of the filing of an appropriate motion for attorney's fees in accordance with E.D.Mo. L.R. 8.02 and an appropriate bill of costs in accordance with E.D.Mo. L.R. 8.03.

ORDER
On July 30, 1997, the Court entered judgment in favor of defendants and against plaintiff on all claims asserted in plaintiff's second amended complaint. Pending before the Court are (1) plaintiff's "Rule 59 Motion for New Trial, For Amendment of Findings of Fact and Conclusions of Law and to Make New Findings and Conclusions, and to direct the Entry of a New Judgment in Favor of Plaintiff," (2) defendants' bill of costs and (3) defendants' motion for attorneys' fees. Additionally, on September 5, 1997, plaintiff filed a "Suggestion of Bankruptcy and Stay," requesting a stay of all further proceedings herein pursuant to the automatic stay provisions of the Bankruptcy Code, 11 U.S.C. § 362(a)(1) ("§ 362").
The Court readily concludes that plaintiff is not entitled to a stay of all proceedings in this matter. Under the automatic stay provisions of the § 362, when a debtor files a bankruptcy petition, a stay of all judicial *902 and nonjudicial proceedings against the debtor and his or her property automatically attaches. See 11 U.S.C. § 362(a)(1) (emphasis added).
[A]s the plain language of the statute suggests, and as no less than six circuits have concluded, the Code's automatic stay does not apply to judicial proceedings, such as this suit, that were initiated by the debtor.
Brown v. Armstrong, 949 F.2d 1007, 1009-10 (8th Cir.1991) (citations omitted). The automatic stay provisions of § 362 do not preclude the Court from ruling on plaintiff's pending post-trial motion. After careful consideration, the Court will deny plaintiff's "Rule 59 Motion for New Trial, For Amendment of Findings of Fact and Conclusions of Law and to Make New Findings and Conclusions, and to Direct the Entry of a New Judgment in Favor of Plaintiff."
Defendants' pending bill of costs and motion for attorneys' fees require separate consideration.[1] The Court will seek the parties' input as to whether the automatic stay provisions of § 362 apply to the pending bill of costs and motion for attorneys' fees which, although part of a proceeding initiated by plaintiff, could arguably be construed as a judicial proceeding against a debator.
According,
IT IS HEREBY ORDERED that plaintiff's "Rule 59 Motion for New Trial, For Amendment of Findings of Fact and Conclusions of Law and to Make New Findings and Conclusions, and to Direct the Entry of a New Judgment in Favor of Plaintiff" [Doc # 182] is denied.
IT IS FURTHER ORDERED that within fourteen (14) days of the date of this order, plaintiff and defendants shall file a memorandum addressing whether the automatic stay provisions of 11 U.S.C. § 362(a)(1) preclude the Court from ruling on defendants' pending bill of costs and motion for attorneys' fees.
NOTES
[1] Unlike the Court, defendants have construed plaintiff's arguments on this point to be an unavailing attempt to resurrect plaintiff's earlier dismissed Count II asserting a distinct cause of action for breach of fiduciary duty.
[2] See Brown v. Retirement Committee of Briggs & Stratton, 797 F.2d 521, 531 (7th Cir.1986).
[3] At least one employee bulletin, entitled "Getting Back to Business: the Disability Management and Rehabilitation Program," explicitly stated the apparent actual practice of the Plan, namely for benefits eligibility to be determined by the Medical Director, upon review of any medical information submitted by the claimant and any additional medical information obtained by the Plan through referral.
[4] The Court notes that the award of Social Security disability benefits to plaintiff is not binding on the Plan's determination. Plaintiff is unable to cite any provision of the Plan, and the Court has found none, which prescribes any particular consideration for a Social Security determination in connection with the Plan's determination of disability. The fact of plaintiff's Social Security award was in the plaintiff's file with the Disability Department and was therefore presumably given some consideration by the Medical Director, although it was not entitled to any particular value in the overall consideration of plaintiff's claim. See Cox v. Mid-America Dairymen, Inc., 965 F.2d 569, 572-73 (8th Cir.1992); Davis v. American General Life & Accident Ins. Co., 906 F.Supp. 1302, 1311 (E.D.Mo.1995) [Limbaugh, J.].
[5] That this is so may explain plaintiff's failure to submit Dr. Kenney's findings to the Disability Department for consideration in connection with his claim for benefits.
[1] Apparently presuming that an automatic stay is in effect, plaintiff has not responded to defendant's bill of costs or motion for attorneys' fees.