Robert SCHINDLER, an Individual, Plaintiff,

v.

METROPOLITAN LIFE INSURANCE COMPANY, a Foreign Corporation, and Sears, Roebuck and Co., a Foreign Corporation, Defendants.

No. 2:99CV150FRN29NF.

United States District Court,
M.D. Florida,
Fort Myers Division.

April 30, 2001.

Carl H. Winslow, Jr., Ft. Myers, FL, for Plaintiff.

Unger, Acree, Weinstein, Marcus, Merrill, Kast & Metz, Orlando, FL, Martin B. Unger, Lee W. Marcus, of counsel, for Defendants.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

Plaintiff Robert T. Schindler brings this action against his former employer, Sears Roebuck and Co., and Metropolitan Life Insurance Company (MetLife), the insurer and administrator of Sears' Group Life and Long Term Disability Insurance Plan (the Plan).[1] MetLife terminated Schindler's long term disability (LTD) benefits after concluding that insufficient evidence existed to support Schindler's claim that he was "totally disabled." Schindler challenges MetLife's termination of his LTD benefits and seeks recovery of those benefits from the date of the allegedly wrongful termination. This court held a bench trial on the matter on March 15, 2001.

After carefully considering the administrative record and the parties' submissions, the court agrees with MetLife's decision to terminate Schindler's LTD benefits on the ground that Schindler is no longer "totally disabled" within the meaning of the Plan. In accordance with Fed.R.Civ.P. 52, the following constitutes the court's findings of fact and conclusions of law.

## BACKGROUND

Schindler worked for Sears as a commission sales person from approximately 1971 until 1988. In 1979, Schindler allegedly sustained severe injuries to his left ankle, upper left leg and right groin area as a result of a non-work related accident with a "roto spader." After recovering from the roto spader accident, Schindler continued in his occupation at Sears.

In the Fall of 1988, Schindler applied for LTD benefits under the Plan, claiming that the injuries he had received in 1979 to his ankle, leg and groin had worsened to the point where he could no longer perform his job as a furniture salesman.[2] Specifically, Schindler claimed that since June 4, 1988, the pain associated with his injuries had grown so constant and intense that he was unable to stand on his feet for any sustained period of time (see Employee's Stmnt. of Claim (9–19–88), Joint Exh 1, § B).

As part of his claim for disability benefits, Schindler submitted an "Attending Physician's Statement of Disability" (APS) from Dr. Michael D. Horowitz. As reflected in the APS, Dr. Horowitz diagnosed Schindler with post traumatic neuropathy, depression and chronic pain. Under the category "subjective symptoms," Dr. Horowitz noted "Severe Pain, paresthesias—with prolonged standing/standing in general. Patient virtually always in some discomfort. Presently,

1. The Plan is an employee welfare benefit plan subject to and governed by the provisions of the Employee Retirement Income Security Act 0f 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*

2. Under the Plan, "Total Disability" means that:
   due to illness or injury, you are unable to perform the material duties of your regular occupation with Sears during the Waiting Period and during the next 12 consecutive months, whether or not the monthly benefits are paid for each of these months. Thereafter, you must be totally incapable due to *illness or injury from performing* the material duties of any gainful occupation for which you are reasonably fit based on training, education or experience.
   (Joint Exh 1, § A).

this is worsened with even brief standing" (APS (10–10–88), *id.*). Dr. Horowitz further stated that Schindler's condition had retrogressed, and that he would not benefit from any therapy (*see id.*). Finally, Dr. Horowitz indicated that while Schindler was totally disabled from his job with Sears, he could work at a job that did not require any standing (*see id.*).

In addition to the APS, Schindler submitted a statement indicating his sales job required him to spend eight hours a day on his feet selling, moving and stocking furniture (*see* Training Education and Experience Stmnt. (9–19–88), *id.*). With respect to his education, Schindler stated that he had completed two years of college, majoring in communications and radio-television-film (*see id.*). Under "special skills", Schindler wrote that "'in house' commission sales is all that I have done in 17 years" (*id.*).

In response to a letter request from MetLife,[3] Dr. Horowitz submitted further documentation in December of 1988, confirming both his diagnosis of Schindler and that Schindler's condition was retrogressed, permanent, and not susceptible to any therapy (*see* Completed Questions to Bach Ltr, *id.*, § C). Additionally, Dr. Horowitz completed a Physical Capacities Evaluation (PCE) stating that Schindler was unable to stand or walk during a eight hour workday, but that he was able to sit for eight hours (*see* PCE (12–15–88), *id.*).

By letter dated January 5, 1989, Met-Life approved Schindler's application for LTD benefits effective from October 23, 1988,[4] continuing for as long as Schindler met the definition of total disability as defined in the Plan (*see* Bach Ltr 1–5–89), *id.*, § D. Shortly thereafter, apparently acting upon his doctor's advice, Schindler relocated from Pennsylvania to Cape Coral, Florida. On August 4, 1989, MetLife requested that Schindler's new primary care physician, Dr. Jane L. Simenson, complete an APS. A month later, Dr. Simenson submitted the requested APS, diagnosing Schindler with post traumatic neuropathy (*see* APS (9–11–89), *id.*, § F). Dr. Simenson described Schindler's condition as improved, indicating that Schindler had some limitation with respect to standing, sitting, balancing, bending, stooping and squatting, among other things (*see id.*). Dr. Simenson further stated that while Schindler was totally and permanently disabled from his previous occupation, she could not determine whether he was disabled from "any occupation" (*id.*). A few months later, however, Dr. Simenson indicated on a subsequent APS that Schindler's condition was "unimproved" and that he was totally disabled from "any occupation" (APS (12–28–89), *id.*, § X).

Schindler continued to supply MetLife with annual APSs completed by Dr. Simenson from 1990 through 1996.[5] In the

---

3. The Plan was originally funded through a group policy issued by Allstate Life Insurance Company to Sears. In 1989, MetLife assumed responsibility for insuring and administering the Plan from Allstate. For ease of reference, this decision will only refer to Met-Life as the Plan's insurer and administrator.

4. As described in the previous footnote, total disability under the terms of the Plan required Schindler to first complete a "waiting period" before receiving long term disability benefits (*see* Plan, Joint Exh 1, § A). Specifically, Schindler had to be unable to perform the

material duties of his job for 140 days within any 180 consecutive day period (*see id.*). Because Schindler claimed disability from June 4, 1988, his waiting period expired 140 days later, on October 22, 1998. Schindler's disability during this waiting period is not in dispute.

5. The administrative record does not contain any APS for 1997. In addition, the court notes that in 1990 Schindler applied for, and was denied, Social Security Disability (SSD) benefits. Because the Plan provided for a setoff should Schindler receive SSD benefits,

September 1990 APS, Dr. Simenson again diagnosed Schindler with post traumatic neuropathy and determined that he was totally and permanently disabled from his previous or any occupation (*see* APS (9–4–90), *id.*, § G). Dr. Simenson also modified her earlier assessment of the limitations on Schindler's activities, indicating that he should now completely avoid any standing or sitting (*see id.*). For the next six years, Schindler's condition and limitations remained essentially unchanged according to the submitted statements (*see* APS (12–2–91), *id.*, § X; APS (11–27–92), *id.*; APS (11–8–93), *id.*; APS (10–6–94), *id.*; APS (11–1–95); *id.*; APS (12–16–96), *id.*).

On January 12, 1998, MetLife requested that Schindler complete a Personal Profile Evaluation (PPE), and that Dr. Simenson complete a Report of Physical Capacity accompanied by her medical records on Schindler. On January 22, 1998, Schindler submitted to MetLife his statement of self evaluation, indicating that (1) his condition was unimproved, (2) his left ankle gave him constant pain and his hip was also painful from favoring his bad leg, (3) his pain only allowed him to sleep three to four hours at a time and, thus, he rested during the day due to lack of sleep, and (4) he had problems walking, standing, sitting or assuming any position for an extended period of time (*see* PPE (1–17–98), *id.*, § J). Schindler also stated on the PPE that his bad leg controlled his daily activities and that "I do what I can around the house when I am feeling up to it, but most of my day is spent going from a sitting position to a reclining position elevating my ankle and reading a book" (*id.*). Additionally, Schindler described limitations on his ability to do housework, shop and participate in hobbies (*see id.*). With respect to his ability to work, Schindler claimed that his inability to walk, stand or maintain any position for any period of time prevented him from returning to his previous occupation or any other occupation (*see id.*).

As requested, Dr. Simenson submitted to MetLife a completed report on Schindler's physical capacity. On a chart entitled "Numbers of Hours Per Work Shift," Dr. Simenson checked, among other things, that Schindler could work "zero" hours standing, kneeling or balancing, and "1–2" hours sitting (*see* Physician's Report of Physical Capacity, *id.*, § K). Additionally, Dr. Simenson indicated that Schindler could never lift more than 51 pounds, but could occasionally (1–33% of the time) lift a lesser amount, and that Schindler's physical limitations prevented him from working any hours (*see id.*). Dr. Simenson submitted her medical records on Schindler dating from 1994 to 1998 with the Physical Capacities Form (*see* Schindler Med. Records, *id.*).

In May of 1998, MetLife hired a private investigator to conduct video surveillance of Schindler in order to ascertain whether his alleged physical conditions were consistent with his daily activities. On May 7, 1998, Schindler was videotaped standing, kneeling, squatting, and lifting and carrying various items while performing tasks associated with the planting of a tree in his front yard, among other things (*see* Joint Exhs 2 & 4A–4DD; *see also* Investigative Report (5–18–98), Joint Exh 1, § L). On May 11 and May 12, 1998, Schindler was viewed performing other tasks involving standing, carrying and walking; but these activities were significantly less physical than the May 7, 1998 yard work (*see id.*).

MetLife hired a company to pursue an appeal of the denial of SSD benefits. In 1994, the Social Security Administration's denial of SSD benefits was upheld and Schindler did not reapply for such benefits.

Acting upon MetLife's request, and unaware of the fact that he had been videotaped and was in fact still under surveillance, Schindler submitted to a FCE performed by the Suncoast Rehabilitation Center on June 10, 1998. The stated objective of the FCE was to assess Schindler's "physical abilities and limitations" using nine different assessments (*see* FCE (6–10–98), Joint Exh 1, § N). The sum of those assessments, contained at the end of the FCE and labeled "General Observations," states in part:

Based on the results of the validated testing procedures used in this Functional Capacity Evaluation, Mr. Schindler put forth maximal effort. He did not demonstrate the ability to function in his previous occupational capacity. A sedentary job where frequent change of position would not hinder productivity or job performance would be required. Ability to concentrate is another area that would require assessing if return to work were plausible as it was noted that as patient's pain perception increased, his concentration appeared to diminish.

(*id.*). MetLife's investigator videotaped Schindler entering Suncoast with no apparent limp or restriction, but leaving Suncoast after the FCE with a slight limp (*see* Joint Exh 2; *see* also Investigative Report (6–12–98), Joint Exh 1, § O). Shortly thereafter, Schindler was taped shopping without any limp (*id.*).

By letter dated July 16, 1998, MetLife terminated Schindler's LTD benefits effective August 1, 1998. MetLife summed up its reasons for the termination, stating:

the limitations given by your attending physician, Dr. Simenson, and your description of your daily activities are inconsistent with your alleged disability as well as your limitations, as confirmed in the surveillance tape. Based on this information we have determined that you no longer meet the definition of disability as defined in your plan

(Heinrich Ltr. (7–16–98), *id.*, § P). Additionally, MetLife sent the surveillance tape to Dr. Simenson for her review and to solicit any comments she might have on the matter.

Dr. Simenson declined to review the videotape, apparently on the ground that a picture cannot serve as a complete evaluation of a patient, and requested that MetLife restore Schindler's LTD benefits. After reminding MetLife that Schindler's recently completed FCE at Suncoast showed both that he put forth "maximal effort" and that his ability to concentrate rapidly diminished as his pain perception increased, Simenson concluded her request by stating:

I would confirm that Mr. Schindler has honestly represented his inability to perform sustained productive work on schedule in a normal work day. Pain is a subjective sensation for which there is no meter, and just because Mr. Schindler appears to perform an activity on one occasion and accept the painful consequences, does not remove him from the ranks of those disabled from work.

(Simenson Ltr. (7–23–98), *id.*, § R). Thereafter, Schindler, acting through counsel, contested MetLife's termination of his benefits and requested a review of his claim.

MetLife responded by submitting Schindler's case on August 18, 1998 to Dr. E. Carroll Curtis, a MetLife doctor specializing in occupational medicine. In addition to reviewing Schindler's case file, medical records and the videotapes, Dr. Curtis spoke by telephone with Dr. Simenson. In particular, Dr. Curtis noted with Dr. Simenson that he believed her medical notes contained little objective evidence supporting Schindler's claimed disability (*see* Cur-

tis Ltr., *id.*, § U). According to Dr. Curtis, Dr. Simenson allegedly stated that her physical examinations of Schindler were always negative, and that she simply put down what Schindler told her he was able to do with respect to his functional capacity (*see id.*). Based on his review of Schindler's case, Dr. Curtis concluded:

> the available evidence fails to support Mr. Schindler's alleged incapacity for work. Instead, it appears to support the view that he is clearly capable of performing many types of work that is [sic] consistent with his education, training and experience, assuming that said work does not require prolonged standing or extensive walking

(*id.*). Dr. Curtis added that no evidence existed to support any significant problem Schindler might have with sitting (*id.*).

After reviewing all the evidence in Schindler's case file, including the additional medical information submitted on appeal, MetLife upheld its termination of Schindler's LTD benefits for the stated reason that "the additional medical information submitted on appeal does not change our previous decision to terminate benefits and the medical evidence in the file does not support a disability which would make Mr. Schindler incapable from performing the material duties of any gainful occupation as defined by the plan" (Marchese Ltr. (9–9–98), *id.*, § V).

Thereafter, Schindler filed suit in state court challenging MetLife's determination to terminate his LTD benefits. The case was removed and on March 15, 2001, this court held a bench trial on the matter.

## STANDARD OF REVIEW

■ Three standards of review are appropriate in ERISA decisions. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). Where a plan administrator is not granted any discretion over distribution of benefits in an ERISA plan, the court applies a *de novo* standard of review. *See Yochum v. Barnett Banks, Inc.,* 234 F.3d 541, 544 (11th Cir.2000) (per curiam) (citing *Marecek v. BellSouth Telecomms. Inc.,* 49 F.3d 702, 705 (11th Cir. 1995)). On the other hand, where the plan grants an administrator discretion, the "arbitrary and capricious" standard applies. *See Yochum,* 234 F.3d at 544 (citation omitted). If the plan grants the administrator discretion, but the court finds a conflict of interest exists in the benefits decision of the administrator, a "heightened arbitrary and capricious" standard applies and the court will consider this conflict in its analysis. *See id.* (citing *Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1566 (11th Cir.1990)). Where, as here, an ERISA plan grants discretion to a plan administrator, the court, will apply, at a minimum, the arbitrary and capricious review and depending on whether a conflict of interest exists, may possibly apply a heightened arbitrary and capricious review. *See HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 993 (11th Cir.2001)

■ Regardless whether the "regular" or "heightened" arbitrary and capricious review applies, the court first evaluates the plan administrator's interpretation of the plan to determine whether it is "right" or "wrong." *See id.* (citing *Godfrey v. BellSouth Telecomms., Inc.,* 89 F.3d 755, 758 (11th Cir.1996)) (stating that the court first conducts a *de novo* review of the administrative record to determine if the administrator's decision was wrong); *see also Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d at 1566 n. 12 ("It is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of a *de novo* review before the

court is concerned with the self-interest of the fiduciary."). Thus, if a court agrees with the ultimate decision of the administrator, it is unnecessary to decide whether a conflict of interest exists. *See Marecek*, 49 F.3d at 705.

But if the court disagrees with the plan administrator's interpretation, it must then determine whether the claimant has proposed a reasonable interpretation of the plan. *See Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1550 (11th Cir.1994). Assuming the claimant's proposed plan interpretation is reasonable, the court then turns to whether the administrator's wrong interpretation of the plan in question is nonetheless reasonable. *See HCA Health Servs. of Georgia*, 240 F.3d at 994. A plan administrator's wrong but reasonable interpretation of the plan is entitled to deference, even in light of the claimant's reasonable interpretation, unless the plan administrator suffers from a conflict of interest. *see id.*

Therefore, the final step in the analysis is to determine whether any conflict of interest exists between the plan administrator and the plan beneficiary. If no conflict of interest is present, the regular arbitrary and capricious standard applies and the plan administrator's wrong but reasonable interpretation of the plan will not be arbitrary and capricious. *See id.* (citing *Lee*, 10 F.3d at 1550). If a conflict of interest exists, however, the heightened arbitrary and capricious standard of review applies and "the burden shifts to the fiduciary to prove that its interpretation of the plan provisions committed to its discretion was not tainted by self-interest." *See Brown*, 898 F.2d at 1566. Put another way, "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or ben-

eficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." *Id.* at 1566–67.

Here, the parties have stipulated that the heightened arbitrary and capricious standard of review applies. Proceeding under that standard, the court thus first determines whether the plan administrator's interpretation is "wrong" from a *de novo* perspective, *see HCA Health Servs. of Georgia*, 240 F.3d at 993, confining its review to the administrative record that existed before the plan administrator at the time of the decision to deny benefits. *See Jett v. Blue Cross and Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1139 (11th Cir.1989).

### DISCUSSION

MetLife contends that its termination of Schindler's LTD benefits was correct and reasonable because Schindler failed to submit sufficient medical evidence to establish that he was "totally disabled" as defined by the Plan. MetLife deems Dr. Simenson's submitted APSs and medical records conclusory and devoid of any objective findings relating to Schindler's disability. In addition, MetLife relies heavily on Dr. Simenson's purported statements to Dr. Curtis—i.e., that her physical examinations of Schindler were always negative, that she simply put down what Schindler told her he was able to do with respect to his functional capacity, and that she refused to watch the videotapes because she viewed herself as a patient's advocate—to discredit her medical opinion on whether Schindler was capable of performing any occupation.

MetLife further argues that Schindler's actions caught on videotape prove that he could do far more than he represented to MetLife and, thus, MetLife was free to

discredit his claims that the pain from his injuries prevented him from performing other occupations. MetLife emphasizes that it was entitled to rely on its own specialist in occupational medicine who—after reviewing Schindler's file and the videotape, and phoning Dr. Simenson—concluded that Schindler was capable of performing many types of work based on his education, experience and training. Moreover, MetLife contends that the burden rested with Schindler to prove that was he totally disabled, and that Schindler failed to submit evidence that he was incapable of performing any gainful occupation based on his education, experience and training.

Schindler asserts that MetLife acted arbitrarily and capriciously in terminating his LTD benefits. Schindler claims his actions on the videotape are not inconsistent with the limitations as described in his medical records. Schindler further argues that MetLife's decision was wrong because (1) the medical documentation contained in the administrative record sufficiently proves that he is totally disabled, (2) the FCE states that he would need additional testing before he returned to work, and (3) MetLife failed to show what type of job he could perform based on his training, education and experience.

Having carefully reviewed all the evidence contained in the administrative record, this court concludes that MetLife's determination to discontinue Schindler's LTD benefits was correct. The Plan required Schindler to submit proof subsequent to the waiting period to establish that he continued to be totally disabled and under the regular care of a physician (see Joint Exh 1, § A). The gravamen of Schindler's disability is the pain associated with the injuries he received to his leg, ankle and groin. The medical evidence submitted by Schindler contains little ob-

jective evidence regarding his disability and, consequently, Schindler's disability is predicated on subjective information, i.e., what he relayed to his treating physician regarding his pain. Schindler's credibility, however, is seriously called into question by the surveillance video which shows him engaging in activity he previously stated to MetLife that he was unable to do. For instance, Schindler represented to MetLife that he really did not engage in activities that were not sedentary, and that he avoided anything that kept him on his feet (see PPE, Joint Exh 1, § J). In contrast, the surveillance video shows Schindler engaging in fairly vigorous yard work with apparently no restrictions on his activity due to pain. Likewise, the activity on the videotape sharply contradicts Dr. Simenson's recent physical evaluation of Schindler's capabilities wherein she stated to MetLife that Schindler could not stand, kneel, or balance for any amount of time, and could never lift over fifty pounds (see Report of Physical Capacity, id., § K). As such, it was correct for MetLife to submit Schindler's medical history and the surveillance tape to its own doctor who specialized in occupational medicine for his review.

MetLife was further correct in primarily relying on Dr. Curtis's subsequent conclusion that Schindler was no longer totally disabled. Dr. Curtis not only reviewed the surveillance tape and Schindler's medical records but, as reflected in his report, he spoke with Dr. Simenson regarding the lack of objective evidence of Schindler's disability in her notes. Dr. Simenson's alleged reply—that her physical examinations of Schindler were always negative and that she determined his functional capacity by simply putting down what Schindler told her he could do—further undermines Schindler's credibility and claim of disability.[6]

Moreover, the fact that MetLife chose not to order additional testing after receiving the results of the FCE does not render its decision unreasonable. After the FCE, MetLife possessed sufficient evidence that Schindler was capable of engaging in many types of gainful employment consistent with his training, experience and education based on its review of Schindler's medical records, the surveillance tape and his personal evaluation. Thus, MetLife did not err by foregoing additional testing regarding Schindler's disability because it already had enough evidence to make its determination as to whether he was totally disabled under the terms of the Plan.

■ Schindler argues that MetLife acted unreasonably because it determined that he was totally disabled without identifying any occupation that he was reasonably fit for based on his training, education and experience. The Eleventh Circuit has not yet spoken as to whether a plan administrator is obligated to obtain vocational rehabilitation evidence before making a final determination of disability where the "any occupation" standard is present in an ERISA plan's definition of total disability. In considering the "any occupation" standard, other Courts of Appeals have held that consideration of vocational evidence is unnecessary where the evidence in the administrative record supports the conclusion that the claimant does not have a disability which prevents him from performing some identifiable job. *See McKenzie v. General Tel. Co. of California*, 41 F.3d 1310, 1317 (9th Cir.1994); *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1309 (5th Cir.1994); *Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1455 (D.C.Cir.1992); *compare Potter v. Con-*

*necticut Gen. Life Ins. Co.*, 901 F.2d 685, 686 (8th Cir.1990) (per curiam) (holding testimony of vocational expert unnecessary where conclusive evidence existed that the claimant had no disability), *with Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan*, 874 F.2d 496, 499 (8th Cir.1989) (holding that a plan administrator should have obtained a vocational expert's opinion to determine if the claimant's physical impairment prevented him from performing "any occupation.").

■ As explained in *Duhon*, the "any occupation" standard is not particularly demanding—it only requires a finding that the claimant could perform any job for which he is, or may become, qualified by education, training or experience. *See* 15 F.3d at 1309. Indeed, the undemanding language of the "any occupation" standard is underscored in *Block v. Pitney Bowes, Inc., supra*, a decision authored by then-Circuit Judge Ruth Bader Ginsburg. Similar to this case, the claimant in *Block* was a salesperson who suffered a painful injury to his ankle and leg. *See* 952 F.2d at 1450. After receiving temporary total disability benefits for a period of time, the *Block* claimant's disability benefits were terminated after the plan administrator received evidence that although the claimant could not return to his past sales job, he could work a full day subject certain limitations on standing (two hours), walking, lifting and bending. *See id.* at 1452.

Challenging the termination, the claimant argued that no vocational evidence existed with respect to jobs for which he was "reasonably fitted by education, experience, capability or training." *Id.* at 1455. In rejecting the claimant's argument,

---

6. According to Dr. Curtis, Dr. Simenson also told him that she saw her self as a patient's advocate, not a judge, and that if MetLife found through surveillance that Schindler was capable of doing more than her functional evaluation of him, then "so be it." (Joint Exh 1, § U).

Judge Ginsburg stated that sufficient medical evidence indicated that

> Block could fill a sales position involving desk and telephone work, some walking, driving and visiting with clients. The medically-indicated limitations were not so great, nor Block's occupation so specialized, that the Committee could be called unreasonable for refusing to conclude that sales positions in the D.C. area for which Block could qualify were scarce.

*Id.* (citations omitted). Like *Block*, the evidence here before MetLife shows that Schindler could walk, bend, lift, and stoop with some limitations. And additional evidence shows that Schindler has had some college education, and that he is performing sedentary activity. MetLife's failure here to adduce specific vocational testimony regarding what jobs Schindler qualifies for based on his education, experience and training is reasonable given Schindler's medical limitations, which are not so great, coupled with his previous occupation as a salesperson, which is not so specialized. The general conclusion reached by MetLife after reviewing Schindler's file—that he is capable of performing many types of work consistent with his training, education and experience—was sufficient in this case.

In sum, the court agrees with the decision to terminate Schindler's LTD benefits on the ground that he no longer meets the Plan's definition of totally disabled. Having so determined, it is unnecessary to reach the question of whether MetLife suffers from a conflict of interest, or what role any conflict might have played in the plan administrator's decision to deny benefits.

## CONCLUSION

After a trial held on March 15, 2001, and having carefully reviewed the administrative record as it existed before the plan administrator, and all of the parties' submissions, the court agrees with MetLife's decision to terminate Robert T. Schindler's disability benefits. Accordingly, the complaint is DISMISSED.

The Clerk of the Court is directed to enter judgment accordingly.