**Richard J. CONTI, D.C., Plaintiff,**

v.

**The EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Defendant.**

**Civ. No. 00–1644 (WGB).**

United States District Court,
D. New Jersey.

Oct. 9, 2002.

William W. Graham, Carey and Graham, Manasquan, NJ, for Plaintiff.

Andrew I. Hamelsky, Raphael Vergara, Wright, Pindulic & Hamelsky, LLP, Paramus, NJ, for Defendant.

*OPINION*

BASSLER, District Judge.

The issue raised by this motion for summary judgment is whether, applying a heightened arbitrary and capricious standard, an insurance company illegally terminated an insured's disability benefits.

Plaintiff Richard J. Conti, D.C. ("Dr.Conti") has brought this action pursuant to Section 1132 of the Employee Retirement Income Security Act of 1974 (ERISA), to recover benefits allegedly due under a disability income insurance policy issued by Defendant The Equitable Life Assurance Society of the United States ("Equitable"). The Court has jurisdiction pursuant to 28 U.S.C. § 1331. This matter is now before the Court on Defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56, and on Plaintiff's cross-motion for summary judgment. For the following reasons, Defendant's motion is **granted**, and Plaintiff's motion is **denied**.

## I BACKGROUND

Unless otherwise indicated, the facts underlying this controversy are undisputed. Plaintiff Richard J. Conti is a chiropractor who practiced in the State of New Jersey until March 1, 1992. Dr. Conti obtained his license to practice in 1983, and began practicing soon thereafter with his brother. On May 23, 1985, while on vacation in the Bahamas, Dr. Conti fractured his cervical spine in a diving accident resulting in two of his three injured cervical vertebrae being wired and fused together.

After approximately six months of rehabilitation and physical therapy, Dr. Conti was able to return to practice, and in 1986 he joined Chiropractic Associates of New Jersey, located in Freehold, New Jersey.[1]

On May 24, 1987, Dr. Conti and his partners acquired disability insurance from Equitable. Equitable issued policy

---

1. According to Plaintiff, the typical daily duties of a chiropractor are as follows: interviewing patients, obtaining a complete family and personal history; obtaining current complaints and performing chiropractic, orthopedic and neurological examinations; taking of x-rays; scheduling and giving a report of findings which would inform the patient of the chiropractor's analysis of their x-rays; reviewing the findings and making treatment recommendations. Thereafter, chiropractic treatments would consist of inspection of the patient's posture and gait, palpation (motion and static) of each area of the spine to elicit diagnostic information, and then the actual adjustment of each area of the spine to remove vertebral subluxation.

number 87–709–407 (the "Policy") to plaintiff Conti effective May 24, 1987. The Policy provided for a monthly benefit of five-thousand dollars ($5,000) in the event of "total disability" as a result of an accident or sickness.[2]

The Policy insured Dr. Conti against "total disability," which was defined to mean that as a result of injury or sickness, the insured is unable "to engage in the substantial and material duties of [his] regular occupation," and is under the regular care and attendance of a doctor. (*Id.*) The Policy also contained a disability income rider that defined "residual disability" to mean that as a result of injury or sickness, the insured is unable to perform: (1) one or more of the substantial and material duties of his occupation; or (2) the substantial and material duties of his occupation for as much time as is usually required to perform them. The Policy's disability income rider did not consider residual disability to exist "for any time [the insured is] not under the regular care and attendance of a doctor." (*Id.*)

On September 18, 1989, Dr. Conti was awakened in his sleep with extreme numbness and burning down both arms. Feeling as though he was having a heart attack, at approximately 2:00 a.m., he rushed himself to the emergency room at the Freehold area hospital. A cardiologist examined him, determined that Plaintiff's symptoms were not heart related, and suggested that his symptoms were related to his previous neck injury. Dr. Conti was later referred to and seen by a neurologist, Amos Katz, M.D. Dr. Katz evaluated Dr. Conti's condition and concurred that his symptoms were related to his cervical spine. Dr. Katz prescribed medication

and recommended that Dr. Conti continue receiving chiropractic adjustments.

On September 22, 1990, while on vacation, Dr. Conti was involved in an automobile accident. Dr. Conti's vehicle was hit by another car and forced off the road. Although Plaintiff does not recall if he had initial symptoms, Dr. Conti alleges that the motor vehicle accident in 1990 caused injury to his cervical spine. Dr. Conti did not immediately go the hospital for his 1990 motor vehicle accident, but in the days after the accident he noticed symptoms in his neck and back which became increasingly evident. Dr. Conti described the symptoms as increased soreness and stiffness.

The following week, when he returned to his practice, Dr. Conti claims to have immediately noticed increased symptoms, which intensified during the next several days. He had severe headaches, neck pain, numbness and burning down his right arm and hand while treating patients. During this time, his partners treated him daily with gentle spinal adjustments, traction, and ice and heat therapies.

With the exception of the treatments he received from his partners, Dr. Conti did not consult a physician about the injuries he allegedly sustained in the motor vehicle accident until February 1991. On February 19, 1991, Dr. Conti made an appointment with Dr. Katz, the neurologist who examined him seventeen months earlier at Freehold Hospital. After the consultation and examination, Dr. Katz set forth his findings in a report dated February 21, 1991. On February 25, 1991, Dr. Katz performed an EMG on Dr. Conti's upper extremities. The test revealed bilateral acute and chronic C6, C7, C8 radiculopathy, right greater than left, and moderate

---

**2.** Dr. Conti provided a detailed disclosure of his prior neck injury when applying for the disability policy.

bilateral carpal tunnel syndrome, left greater than right. These findings are confirmed in another report dated February 26, 1991.

On December 19, 1991, Dr. Conti scheduled an appointment with Dr. Katz to discuss his continued health concerns. Dr. Katz referred him to Dr. Banzon, a local orthopedic surgeon. Dr. Conti was scheduled for an MRI at Imaging Center, Freehold, New Jersey. The MRI report dated January 27, 1992 states: "Conclusion: Anterolisthesis of C5 on C6 which reduces with head extension."

Anterolisthesis is instability of the cervical spine. In Dr. Conti's case, the reported instability allowed the 5th cervical vertebra to move independently in relationship to the 4th and 6th cervical vertebrae. The reported instability exists because Dr. Conti's 5th vertebra is not effectively supported and restrained by ligament or surgical bone fusion. After reading the MRI results, Dr. Banzon referred Dr. Conti to Dr. Cary Glastein, an orthopedic surgeon.

On February 5, 1992, Dr. Conti was examined and x-rayed by Dr. Glastein, who reviewed all previous diagnostic tests and reports. Dr. Glastein's impressions were documented in his report dated February 5, 1992 as follows:

> Evidence of cervical instability with definite cervical radiculopathy both clinically and on EMG's. My feeling at this time, is that he has marked radiculopathy secondary to pain at the free segment above his fused cervical spine. It is my feeling that his symptoms are exacerbated by his line of work, and although I hesitate to suggest to him that he give up his chiropractic practice, it is my feeling that it may be necessary. As far as further surgery is concerned, because he has had extensive cervical spine sur-

gery at this point, I would suggest that he avoid this at all costs.

Although Dr. Conti allegedly felt increasing effects as a result of the 1990 automobile accident, from the time of the accident until early 1992 Dr. Conti continued to function as a chiropractor. On February 24, 1992, approximately a year and a half after the 1990 automobile accident, Dr. Conti made a claim for benefits under the Equitable Policy and indicated that he would be withdrawing from chiropractic practice, on the grounds that his injury prevented him from being able to practice effectively and without pain. Thereafter, Dr. Conti ceased his chiropractic practice on March 1, 1992.

On the claim form filed with Equitable, Dr. Conti represented that his disability occurred as a result of the injury to his cervical spine attributable to the automobile accident on September 22, 1990. On the claim form, Dr. Conti also stated that his chiropractic duties included (1) "[l]ifting patients/helping them turn on adj[usting] table"; (2) "[u]sing hands and arms as levers and applying a downward compressive thrust to patient's spine"; and (3) "[b]ending over patients to adjust the cervical spine with my neck in an extended position." (*Id.*)

After retiring from practice, on March 10, 1992, Dr. Conti was examined by Dr. Martin Savitz of Nanuet, New York. Dr. Savitz is a professor of neurosurgery at Mt. Sinai Hospital in New York, and is a published author on the subject of neurosurgery. Dr. Conti asked if there was some procedure that would allow him to practice again. He explained, in detail, his daily activities and duties as a chiropractor and his symptoms as a result. Dr. Savitz's prognosis, confirmed in his report dated March 10, 1992, was the same as Dr. Glastein's.

In May 1992, Dr. Conti was scheduled for another EMG. He was examined by Dr. J. Masceri, M.D. In a report dated May 19, 1992, Dr. Masceri concluded:

It is clear after speaking with Dr. Conti also after examining him that he is unable to perform his job as a chiropractor. The majority of his work involves performing adjustments. His ability to perform proper adjustments is limited because of his weakness and pain symptoms. It is also apparent that the physical activity required to perform his job would cause and increase in his symptoms.

(Def.Ex.17). Thereafter, in a report dated May 26, 1992, Dr. Kenneth Berc confirmed Dr. Conti's "[c]urrent total disability."

Based upon Equitable's review of information available to it during the course of 1992, Dr. Conti's claim was paid. In June of 1992, Equitable began paying Dr. Conti disability benefits in the amount of $5,000 per month. During the course of the claim, although he no longer worked as a chiropractor, Dr. Conti continued to work at the offices of Chiropractic Associates of New Jersey, performing paperwork and exams. He continued to perform those duties until approximately August, 1992, when he stopped working for Chiropractic Associates entirely.

On November 9, 1995, Dr. Conti submitted to an independent medical examination ("IME") at Equitable's request with David N. Shaw, M.D. Dr. Shaw concluded in a report dated December 6, 1995, that Dr. Conti could not function as a chiropractor, either part time or full time. He also concluded that he would undoubtedly, in the future, have significant on-going difficulties and his deficits may worsen over time, due to age and related changes anticipated with arthritis. Based upon the independent medical exam conducted by Dr. Shaw, Equitable continued to pay Dr. Conti benefits.

During 1996 and 1997, Dr. Conti continued to submit monthly progress reports required by Equitable, which listed his activities as either pursuing an acting career or nothing at all. Based on video tapes submitted to the Court, it would also seem that during this time, Dr. Conti made appearances from time to time as a stand-up comedian. In late 1997, Equitable performed surveillance to locate Dr. Conti's whereabouts in California and determine his activities.

During surveillance, Dr. Conti was videotaped playing golf on November 12, 21, December 1, 3, and 10, 1997.[3] During the November and December surveillance, Dr. Conti was seen practicing at a driving range, hitting approximately 80 to 100 balls in an outing. The tapes show Dr. Conti practicing his golf game without apparent pain or restriction. Dr. Conti was also observed carrying his golf bag over his right shoulder and bending to place his golf ball on the tee with his right arm. On more than one occasion while playing golf Dr. Conti struck the ground with his club while swinging, causing a divot. Also on more than one occasion, Dr. Conti could be seen on the tapes lifting his arms over his head to close the trunk of his hatchback car.[4]

---

3. The videotapes of Dr. Conti playing golf (as well as the tapes of him performing at various comedy clubs) were submitted to the Court along with the other materials in relation to the pending motions. The Court has reviewed the tapes, and finds that they are what they purport to be: video recordings of an individual identified as Plaintiff Conti playing golf and performing as a stand-up comedian. The video tapes of Dr. Conti playing golf give added meaning to the adage that a picture is worth a thousand words.

4. At his deposition, Dr. Conti mentioned that he had problems putting his arms over his

Equitable notes that during the time period Dr. Conti resided in California, he did not visit any medical doctors in the California area regarding his alleged condition.[5] According to Equitable, Dr. Conti's only appointments with physicians occurred when he returned to New Jersey.

In January 1998, Dr. Conti was asked to submit to another Equitable IME. On February 10, 1998, he complied with the request and met with Gerald M. Paul, M.D., an orthopaedic surgeon with offices in Los Angeles, California. Dr. Paul provided a detailed summary of Dr. Conti's activities as captured on the surveillance tapes, which according to Dr. Paul evidenced Plaintiff's ability to freely move his neck and use his upper extremities without apprehension or difficulty.

In a report dated February 12, 1998, Dr. Paul found that Dr. Conti had patchy hypoesthesia along with radial aspect of his right forearm, volar aspect of his right thumb, index and forefinger. There was upper arm and forearm atrophy. Dr. Paul also stated that Dr. Conti had a serious spinal injury and that he had neurological compromise. In fact, on physical examination, Dr. Paul states that, "he has measurable atrophy in his right upper extremity and slight weakness." Dr. Paul acknowledged that Dr. Conti has a degree of neurological impairment in the upper extremities; he has residual nerve damage in the upper extremities; he has atrophy in the upper extremities; and all of this is a result of the significant injury in his cervi-

cal area. (Pl.Ex. 13; Tr. 77–78.) Even with the foregoing injuries, however, based upon his examination of Dr. Conti, a review of Dr. Conti's medical records, and review of the surveillance tapes, Dr. Paul opined that Dr. Conti was capable of performing the usual and customary duties of a chiropractor. In Dr. Paul's words, "it's only fair to state that the frequent and repetitive activities Dr. Conti performs, during his many rounds of golf and visits to the driving range, would put a far greater load on his neck than performing the usual and customary duties of a chiropractor." (Ex. 24 of Def.'s Exhibits.)

On March 6, 1998, Equitable sent a letter to Dr. Conti explaining that Dr. Paul had concluded Dr. Conti was capable of performing the usual and customary duties of his occupation as a chiropractor. The letter also informed Dr. Conti that a copy of Dr. Paul's report had been faxed to Dr. Katz in New Jersey for his review. Equitable placed Dr. Conti on notice that if Dr. Katz did not comment on Dr. Paul's findings within two weeks, they would assume Dr. Katz to have agreed with Dr. Paul's assessment.

On March 18, 1998, Equitable informed Dr. Conti that no comments had been received from Dr. Katz, and that Equitable therefore assumed Dr. Katz agreed with Dr. Paul's opinion that Dr. Conti was capable of returning to full-time work as a chiropractor. As of March 18, 1998, Equitable closed Dr. Conti's file.

head and that a concussive injury occurred to his neck anytime he suffered a reverberating vibration from hitting his hand against something hard. (See Dep. of Richard J. Conti of 11/1/00, at 97:2–8, 106:8–22, Exhibit 8 of Def.'s moving papers.) Because it involves striking the ground with the head of a golf club and dislodging a chunk of turf and/or earth, the "taking of a divot" produces a rebound into the hands, arms and shoulders.

(See Report of Thomas F. Fasulo, D.C. of 4/22/99, Exhibit 38 of Def.'s moving papers.)

5. According to Dr. Conti, On May 31, 1996, he started treatment with Allen Rosenthal, D.C., of Woodland Hills, California. During this same period, he started a rehabilitation program to prevent atrophy, improve his strength and flexibility and to increase function.

Shortly after the denial of his benefits, Dr. Conti retained counsel to represent him, and returned to New Jersey to be examined by Dr. Katz. He was also referred to Michael A. Sabia, D.C. and Peter H. Schmaus, M.D. for second and third opinions. Additionally, Dr. Conti had cervical x-rays taken on March 18, 1998 by his brother, Dr. Robert Conti. By letter dated April 9, 1998, Dr. Conti's attorney sent Equitable Dr. Katz's report dated March 28, 1998, Dr. Sabia's report dated April 1, 1998 and Dr. Schmaus' report dated March 24, 1998. Each report indicated that Dr. Conti was permanently disabled and should no longer practice as a chiropractor.

On April 20, 1998, Equitable invited Dr. Paul to prepare a supplemental report on Dr. Conti's purported disability, to answer specific questions raised by Dr. Conti's physicians. In a supplemental report dated April 30, 1998, Dr. Paul opined that Dr. Conti had sufficient strength to perform chiropractic care on either a full-time or part-time basis, and that Dr. Conti's sensory loss on his right side should not prohibit the act of palpitating a spine.

On July 16, 1998, Equitable's in-house medical consultant, Dr. Feingold, reviewed Dr. Paul's supplemental report in light of the concerns raised by Dr. Conti's own physicians. Dr. Feingold felt that Dr. Paul's responses were clear and unwavering and agreed with Dr. Paul's assessment that Dr. Conti could return to work as a chiropractor and that there was no instability of the cervical spine.

By letter of August 4, 1998, Equitable again denied Dr. Conti's claim for total disability benefits, allegedly after a complete review of the claim file, the new medical information provided by Dr. Conti, and the supplemental report from Dr. Paul. In the August 4 letter, Dr. Conti was informed of Equitable's conclusion that he was capable of performing the substantial and material duties of his occupation on a full-time basis and that Equitable had decided no further benefits were payable under the terms of his contract.

Additionally, in the August 4, 1998 letter Equitable informed Dr. Conti of his right to appeal the decision under ERISA. Following the August 4, 1998, denial, Dr. Conti's attorney informed Equitable by letter of August 6, 1998, that Dr. Conti intended to appeal the decision pursuant to ERISA. In response, Equitable told Dr. Conti's attorney that it was Dr. Conti's responsibility to submit further evidence in support of his claim within 90 days from the August 6, 1998 letter (by November 2, 1998). No further evidence supporting Dr. Conti's claim was provided within the 90 days subsequent to the August 4, 1998 denial letter.[6]

On October 28, 1998, Dr. Conti filed suit in the Superior Court of New Jersey, Monmouth County, to recover benefits under the Policy.[7] In the course of the present litigation, Dr. Conti admitted to having performed spinal manipulations two or three times per month for both friends and relatives since the date of his disability. Dr. Conti has also admitted to playing golf at several different golf courses approximately 40 to 50 times per year since 1995.

During the course of discovery, Dr. Thomas F. Fasulo, a chiropractor, performed yet another IME of Dr. Conti on April 22, 1999. In addition to physical testing of Dr. Conti, Dr. Fasulo reviewed the two surveillance videotapes of Dr. Con-

---

6. As will be discussed, however, Equitable did review additional medial evidence during the protracted course of litigation in this matter.

7. Defendant removed the matter to this Court shortly thereafter.

ti. During his review of the videotapes, Dr. Fasulo noted that Dr. Conti takes "many" divots over the course of his golf games. After his consultation and examination with Dr. Conti, Dr. Fasulo opined that Dr. Conti was not totally disabled and could practice as a chiropractor by using the aid of various chiropractic techniques and equipment. In his report, Dr. Fasulo noted that Dr. Conti could handle approximately 20 to 30 patients per day.

Equitable also sent the surveillance videotapes of Dr. Conti playing golf to Dr. David Shaw, the orthopedic surgeon who did the initial independent medical exam of Dr. Conti on November 9, 1995. Dr. Shaw reviewed the two surveillance tapes concerning Dr. Conti; after reviewing the videotapes, Dr. Shaw concluded in a report dated May 19, 1999 that Dr. Conti was not disabled from performing his occupation. Specifically, Dr. Shaw stated that "I can see no reason for this patient being disabled from doing his usual and customary occupation" as a chiropractic physician. Further, Dr. Shaw explained that had he seen the videotapes at the time of his original evaluation, he would have provided a different conclusion.

Plaintiff thereafter asked Dr. Shaw to examine more recent test results. After reviewing a CT scan of cervical spine report dated November 24, 2000, an x-ray of cervical spine report dated November 17, 2000, and an x-ray of cervical spine report dated February 12, 1986, Dr. Shaw agreed that these reports indicate that the condition of Dr. Conti's cervical spine was getting worse.

On June 4, 1999, Dr. Conti was referred to Jeffrey Fossati, M.D. Dr. Fossati's curriculum vitae indicates that from July 1995 to present he has served as Physiatrist, University Institute for Rehabilitation, Out-patient Facility, Medical Director, Livingston, New Jersey. Based on Dr. Con-

ti's reports, he concluded that Dr. Conti's neurological deficits limited his ability to perform as a chiropractor. Dr. Fossati recommended that Dr. Conti begin physical therapy and continue to take anti-inflammatory medication.

It is the contention of Equitable that Plaintiff can perform the important duties of his occupation as a chiropractor. Dr. Conti maintains that he can no longer "engage in the substantial and material duties of his regular occupation" as a chiropractic physician as a result of his cervical condition. Both Equitable and Dr. Conti can point to doctors who agree with their respective positions, and both can point to doctors who disagree with their respective positions. Given the clear conflict of medical opinions, the Court must determine whether Equitable acted arbitrarily and capriciously in rejecting Dr. Conti's medical evidence in favor of its own.

## II. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment is appropriate in this case only if all the probative materials in the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Hersh v. Allen Prods. Co.,* 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983). An issue involving a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988).

The court must resolve all reasonable doubts in favor of the nonmoving party when determining whether any genuine issues of material fact exist. *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2

(3d Cir.1983); *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972).

The denial of benefits challenged under Section 1132(a)(1)(b) of ERISA is generally limited to the administrative record and is scrutinized under an arbitrary and capricious standard by the district court. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d·80 (1989)(de novo unless fiduciary has discretion to determine benefits.); *Moats v. United Mine Workers of America Health and Retirement Funds*, 981 F.2d 685, 688 (3d Cir.1992)(standard of review is arbitrary and capricious). Under such a standard a district court may overturn a decision of a Plan Administrator only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya ·v. Hoffmann–La Roche, Inc.*, 2 F.3d 40 (3d Cir.1993) (citation omitted). But where (as here) a party administers benefits out of its own funds the court is to apply a "heightened arbitrary and capricious standard." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377 (3d Cir.2000) (arbitrary and capricious standard is sliding scale between absolute deferential review and minimally deferential review).

A review of a plan administrator's record will of course contain conflicting medical opinions, but that does not defeat a motion for summary judgment because the question which the summary judgment criteria is applied to is whether there is a genuine issue of·material fact that Equitable acted arbitrarily and capriciously in accepting its medical evidence and rejecting Dr. Conti's.

### B. *Plaintiff's ERISA § 1132 Claim*

It is undisputed that the individual disability policy held by Plaintiff is part of an employee benefit program governed by ERISA. Traditionally, courts have applied an arbitrary and capricious standard of review when examining an ERISA fiduciary's denial of plan benefits. Such a deferential standard required the Court to determine only whether the fiduciary's decision was "without reason, · unsupported by substantial evidence or erroneous as a matter of law." *Abnathya*, 2 F.3d at 45 (3d Cir.1993).

In reviewing an insurance company's benefits denial under an ERISA plan which allows the insurance company to both determine eligibility for benefits and pay those benefits out of its own funds, however, the Third Circuit has found a conflict of interest to exist which may require a heightened form of arbitrary and capricious review. *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 378 (3d Cir.2000). The Third Circuit has described this heightened standard as a sliding scale approach that allows each case to be examined on its facts. *Id.* at 392.

The *Pinto* sliding scale approach allows the court to "take into account the sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and" the employer of the insured. *Id.* Under this heightened standard of review, the Court is "deferential, but not absolutely deferential." *Id.* at 393. The greater the evidence of a conflict on the part of the administrator, the less deferential a court's abuse of discretion standard should be.

The Third Circuit guided courts to "look not only at the result—whether it is supported by reason—**but at the process by which the result was achieved.**" *Id.* (emphasis added). If a court finds a reasonable fact finder could conclude that an insurer's decision to credit its doctors over a Plaintiff's doctors "was the result of self-dealing instead of the result of a trustee

carefully exercising its fiduciary duties to grant [claimant] the benefits due her under the insurance plan," then granting summary judgment is inappropriate. *Pinto*, 214 F.3d at 394.

■ Equitable argues that under the *Pinto* sliding scale, its decision should be examined under an almost absolute deferential review. Defendant notes that it handled Plaintiff's claim with care and according to standard claim procedures. After Dr. Shaw's IME found Plaintiff to be totally disabled, Equitable paid Plaintiff benefits until such time as routine surveillance revealed Plaintiff playing golf. Rather than deny his benefits outright, Defendant sent Plaintiff for a second IME. After the second IME concluded Plaintiff could return to work, Defendants informed Plaintiff they would terminate his benefits if he did not provide new evidence of disability. When Plaintiff's own physicians reached contrary conclusions, Defendant provided those conclusions to its examining doctor, who again concluded Plaintiff could work. In finally denying Plaintiff benefits, the Equitable informed Plaintiff of his right to appeal the decision. Based on the foregoing, Equitable argues it can not be found to have acted in an arbitrary or capricious manner.

In opposition, Dr. Conti's primary argument is that the opinions of Dr. Shaw and Dr. Paul, which Equitable relied upon in support of their decision to terminate his disability benefits in February 1998, do not meet the admissibility requirements of Rule 702 of the Federal Rules of Evidence.[8] Dr. Shaw and Dr. Paul both indicated at their depositions that they have no background, training, knowledge, or experience in the physical requirements involved in working as a chiropractic physician. Therefore, Plaintiff seeks to exclude their reports from the Court's consideration, on the grounds that they are not competent to offer opinions about Dr. Conti's ability to continue to practice. Without their testimony, Plaintiff theorizes that Defendant has no evidence to support its position, and accordingly claims he is entitled to summary judgment because of the absence of any evidence to contradict his position.

Simply put, Plaintiff's position borders on the absurd; under Plaintiff's reasoning, only the opinion of a chiropractor would be admissible to prove whether Dr. Conti is fit to practice as a chiropractor.[9] At best, Plaintiff's criticisms go to the weight that should be afforded to the doctors' testimony, not to its admissibility. More importantly, Plaintiff's position entirely ignores that the relevant inquiry is whether Equitable acted in an arbitrary and capricious manner in relying on the opinions of Drs. Paul, Shaw, and Fasulo in denying Plaintiff's request for benefits.[10] Whether the opinions are ultimately admissible as *expert* opinions in a federal court is absolute-

---

**8.** Plaintiff also challenges Dr. Fasulo's evaluation on "net opinion" evidentiary grounds.

**9.** As mentioned, Plaintiff has also attempted to discredit the findings of Dr. Fasulo, who IS a chiropractor, and who also found Plaintiff able to work.

**10.** Plaintiff asks the Court apply a *de novo* standard of review. Plaintiff attempts to find support for his position in an unpublished decision of Judge Simandle, *Gregory Forchic, et al. v. Lippincott, Jacobs & Gruder, et al.*, cv.

No. 98–5423 (D.N.J. November 29, 1999). Ignoring that the Forchic decision is an unpublished District Court decision which could never amount to more than persuasive precedent, the Court notes that the Forchic decision was issued before the Third Circuit's detailed *Pinto* opinion. Given the clear directive of *Pinto*, the Court can find no basis to apply anything but a significantly deferential standard of review, absent evidence of improprieties or inequities in Equitable's claims-review procedures.

ly beside the point; the Court must instead determine whether, in a light most favorable to the Plaintiff, Equitable's decision based on those reports in 1998 and 1999 was "without reason, unsupported by substantial evidence or erroneous as a matter of law," measured by a heightened scrutiny arising out of the inherent conflict of interest when the Plan Administrator both funds and determines benefits.

Plaintiff's sole remaining argument is that, even if the doctors' opinions are admissible, Equitable's decision was arbitrary and capricious because the doctors' opinions are completely outweighed by the reports presented by Dr. Conti's own treating physicians. Having reviewed all of the evidence in the record, the Court agrees that Plaintiff's argument would have been important if the Court were applying a *de novo* standard of review. That having been said, the many conflicting reports have little bearing on the Court's analysis under an arbitrary and capricious standard, because the "he said/she said" between the many doctors in this dispute sheds little light on the internal propriety of Equitable's decision, or whether there was an adequate foundation for it.

Taking all of the evidence in a light most favorable to Plaintiff, a reasonable trier of fact could conclude from the reports of Plaintiff's physicians that Dr. Conti is disabled and cannot perform the material duties of a chiropractor. But that is not what is at issue here: whether Equitable acted arbitrarily and capriciously. Viewing the facts in the same favorable light, a reasonable trier of fact can not escape uncontroverted evidence that Equitable

based its decision to terminate Dr. Conti's benefits on the opinions of several doctors,[11] and did so after giving Plaintiff repeated opportunities to offer rebuttal evidence from his own doctors. Equitable's records reflect that Dr. Conti's physicians' reports were considered, and were even forwarded to one of Equitable's own doctors for review. In the face of such measured consideration of Dr. Conti's medical condition, even taking all of the evidence in a light most favorable to Plaintiff, it would be impossible for a trier of fact to conclude that Equitable acted in an arbitrary and capricious manner.

The decision of Equitable was rational, supported by substantial evidence and not erroneous as a matter of law. In other words it was not arbitrary or capricious or an abuse of discretion. *Abnathya*, 2 F.3d at 45. It withstands a heightened arbitrary and capricious review: the result was reasonable (particularly in light of the video tapes)and the process was free of suspicious irregularities and inconsistencies. Applying the *Pinto* sliding scale to this case, the decision of Equitable is entitled to considerable deference. A fact finder could not conclude that Equitable's decision to credit the medical opinions it relied upon rather than those Dr. Conti's was the result of self-dealing rather than a good faith decision of a fiduciary. Since there is no genuine issue of material fact as to whether Equitable acted arbitrarily and capriciously, it is entitled to summary judgment.

## III. CONCLUSION

For all of the foregoing reasons, Defendant Equitable's motion for summary

---

**11.** Criticism of how the doctors arrived at their conclusions is distinct from criticism of how Equitable relied upon those conclusions. While Plaintiff has raised a number of concerns with *how* Drs. Shaw, Paul, and Fasulo arrived at their conclusions that he was not disabled, he can not dispute that they all reached the same conclusion or that Equitable relied on their conclusions in making its decision.

judgment is **granted**. Dr. Conti's motion for summary judgment is **denied**.