Ronald J. OSBUN, Plaintiff,

v.

AUBURN FOUNDRY, INC., and Auburn Foundry, Inc. Retirement Income Plan, Defendants.

No. 1:03–CV–063.

United States District Court,
N.D. Indiana,
Fort Wayne, Division.

Oct. 28, 2003.

Christopher C. Myers, Christopher Myers and Associates, Fort Wayne, IN, for Plaintiff.

Douglas D. Powers, M. Kristin Glazner, Baker & Daniels—FW/IN, Fort Wayne, IN, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

### I. INTRODUCTION

This matter is before the Court[1] on the parties' cross-motions for summary judgment. Defendants Auburn Foundry, Inc., and Auburn Foundry, Inc., Retirement Income Plan (collectively, "Auburn") filed their motion for summary judgment on May 30, 2003. Plaintiff Ronald J. Osbun ("Osbun") filed his response and cross-motion for summary judgment on September 5, 2003. Auburn filed its reply to Osbun's response and its response to Osbun's cross-motion on September 22, 2003.

Osbun declined to file a reply, although he filed a brief statement of supplemental authority on September 29, 2003. The cross-motions are therefore ripe for review.

Osbun's claim is based on 29 U.S.C. § 1132, better known as § 502 of the Employee Retirement Income Security Act ("ERISA"). Osbun alleges that Auburn arbitrarily and capriciously terminated his long-term disability benefits and seeks to recover them under § 502(a)(1)(B).

The record consists only of the affidavit of Auburn's Benefits Manager, Lori Wenino ("Wenino").[2] There are several exhibits attached to the affidavit, which together comprise all relevant evidence available to Auburn when it made the decision to terminate Osbun's benefits.[3]

After examining the motions and the relevant law, the Court finds that Auburn's motion should be DENIED and Osbun's motion should be GRANTED.

### II. FACTUAL BACKGROUND

For much of his life, Osbun has coped with a host of physical and mental infirmities: mild mental retardation, illiteracy, total blindness in his right eye, partial blindness in his left eye, total deafness in his right ear, and partial deafness in his left ear. (Exs.B, K.) In spite of these difficulties, he performed heavy physical labor at Auburn for roughly twenty years. (Ex. B.) However, his working days came to an end in 1990, when he sustained a back injury on the job. (Ex. B.) Upon examination after the accident, Dr. Stephen Ribaudo ("Dr.Ribaudo")[4] determined

---

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

2. Wenino also filed a supplemental affidavit, but it is not referenced in this opinion.

3. Given the brevity of the record and for the sake of simplicity, citations to Wenino's affidavit are styled as "Aff. ¶——", and citations to the affidavit's exhibits as "Ex. ——."

4. Dr. Ribaudo is board certified in physical medicine and rehabilitation and is also a Fellow of the American Academy of Physical Medicine and Rehabilitation. (Exs.B, K.)

that Osbun had "degenerative lumbar disc disease causing lower back pain," and that due to this and Osbun's other maladies, Osbun was "totally disabled and [unable to engage] in gainful employment." (Ex. B.) Based on this determination and the provisions of Auburn's Retirement Income Plan ("the Plan"), particularly § 4.05(b),[5] Auburn began paying disability benefits to Osbun. (Aff. ¶ 7.)

The Plan provides that a participant receiving disability benefits "may be required by the Plan Administrator to provide satisfactory proof of his continued disability." (Ex. A. § 4.05(d).) Accordingly, at the request of Auburn, Dr. Kain Oo ("Dr.Oo") reexamined Osbun on July 21, 2000. (Ex. C.) Dr. Oo determined that Osbun remained permanently and totally disabled and could not return to work. (Id.) Dr. Oo also catalogued Osbun's physical capabilities, finding that Osbun could not stand or walk for any length of time, lift more than five pounds, drive, climb, bend, stoop, squat, or push and pull with his arms, legs, or body. (Id.) After this examination, Auburn continued to pay disability benefits to Osbun. (See Aff. ¶ 8.)

Roughly two months later, Dr. Oo called Leisa Fluke ("Fluke"), Auburn's Benefits Coordinator, to report that she observed Osbun when she chanced upon him at a local gas station. (Ex. D.) According to Fluke,[6] Dr. Oo expressed concern that Osbun might have misrepresented his physical condition to her at the July examination; in Dr. Oo's office, Osbun had been "walking with a [cane] and bent over," but at the gas station Osbun "was walking fine and without the assistance of his [cane]."

(Id.) Dr. Oo "was concerned and wanted to bring this to [Auburn's] attention and ... did not want to get herself into any trouble for not reporting it." (Id.)

As a result of Dr. Oo's phone call, Auburn hired an investigator to perform video surveillance on Osbun on May 12 and 13, 2001. (Aff. ¶ 10; Exs. E, F.) Source Investigations, Inc., produced a five-page surveillance report and roughly 1.5 hours of videotape from its observations of Osbun. (See Exs. E, F.) The videotape depicts Osbun performing several physical tasks, including: (1) driving a vehicle; (2) carrying what appears to be a full five-gallon water jug; (3) picking up two bricks from the ground; (4) picking up two children's tricycles from the ground; (5) attaching a trailer to a vehicle; and (6) hand-washing and vacuuming two vehicles. (Exs.E, F.)

On June 21, 2001, Auburn terminated Osbun's disability benefits, as it no longer considered him "totally disabled." (Ex. G.) Auburn cited only the video surveillance tape as evidence that Osbun no longer met the Plan's definition of "totally disabled," explaining that "[t]he activities which were performed [on the videotape] were extensive and not those which a permanently and totally disabled person would be able to perform." (Id.) Accordingly, Auburn "determined that [Osbun is] *not* unable to engage in any occupation or employment." (Id.)

On August 10, 2001, Osbun sent Auburn a "Request for a Full and Fair Plan Review" arguing for reinstatement of his benefits. (Ex. J.) Osbun also enclosed several

5. Under the Plan, a participant is "totally disabled" if he has "suffered a condition of bodily or mental injury or disease which renders him unable to engage in any occupation or employment for wages, profit or gain, and the condition is expected to be permanent and continuous during the remainder of his lifetime." (Ex. A § 4.05(b).)

6. Fluke's memo summarizing Dr. Oo's statements is the only evidence of this conversation in the record. Accordingly, neither Auburn nor the Court knows for how long Dr. Oo saw Osbun, from what distance, the activities he performed, or practically anything else.

pieces of evidence which he believed supported a finding of continued disability. First, he submitted a medical report prepared by Dr. Ribaudo on July 5, 2001, which concluded that he remained totally and permanently disabled. (Ex. K.) Dr. Ribaudo opined that Osbun's condition was "actually worse than the last time he was seen" in 1990, as his litany of medical woes had since expanded to include (1) "ASHD ... /post myocardial infarction,"[7] (2) thyroid insufficiency; (3) high blood pressure; and (4) arthritis in his left hip. (*Id.*) Second, Osbun submitted the signatures of five people who claimed to have seen him walking with a cane and a considerable limp. (Ex. L.) Finally, Osbun included a videotape of his own, which included footage of him walking with a cane and then limping slowly without a cane. (Ex. M.)

Auburn was not swayed by Osbun's new evidence, and it denied his appeal on October 5, 2001. (Ex. N.) In a letter explaining the decision, Auburn cited its surveillance video as "[t]he most compelling evidence that Mr. Osbun is no longer disabled." (*Id.* at 2.) Auburn claimed that "the ease" with which Osbun performed the physical tasks depicted in the surveillance video provided "a strong indication that he can perform substantial gainful activity." (*Id.*) Auburn also cited Dr. Oo's phone call, saying that she "observed behavior ... inconsistent both with his behavior during his examination as well as, in her opinion, an ongoing disability status." (*Id.*) Auburn inferred from this evidence that Osbun had "not been truthful in presenting his condition to the doctors that have examined him," and consequently it "discounted significantly the weight accorded the reports of Drs. Ribaudo and Oo." (*Id.*)

7. Presumably, "ASHD" is short for "arteriosclerotic heart disease." *See, e.g., Herring v. Can. Life Assurance Co.*, 207 F.3d 1026, 1028 (8th Cir.2000) (using "ASHD" for "arteriosclerotic heart disease").

For these reasons, Auburn refused to reinstate Osbun's benefits.

## III. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.2003). When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The Court's only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). If the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## IV. DISCUSSION

*1. Auburn's Decision Cannot Be Overturned Unless It Was Arbitrary and Capricious*

 Osbun's claim arises under ERISA § 502(a)(1)(B), which enables a "participant"[8] in an employee benefits

8. The parties do not dispute that Osbun is a "participant" as defined by ERISA. *See* 29 U.S.C. § 1002(7) (ERISA § 502(7)).

plan "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."[9] When a plaintiff seeks benefits under § 502(a)(1)(B), the defendant's decision to deny or terminate benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 112, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). However, where the plan confers discretionary power on an administrator or fiduciary, "the proper standard of review is the deferential 'arbitrary and capricious' one." *Ramsey v. Hercules Inc.,* 77 F.3d 199, 202 (7th Cir. 1996).

■ Much ink has been spilled debating what plan language confers the necessary discretion on administrators to trigger deferential review. *See, e.g., Herzberger v. Standard Ins. Co.,* 205 F.3d 327, 329 (7th Cir.2000) (collecting cases). Accordingly, the Seventh Circuit specified the following "safe harbor" language: "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them." *Id.* at 331. While there are no "magic words" necessary to ensure that an administrator's decisions will receive deferential review, language such as that suggested by *Herzberger* is sufficient. *Id.* Here, the Plan provides that "[t]he administrator has the absolute discretion to determine eligi-

bility for benefits and to construe and interpret the terms of the Plan." (Ex. A § 7.12(a).) This language affirms the administrator's discretion in terms even stronger than the Seventh Circuit's "safe harbor" language. Thus, this Court cannot overturn Auburn's decision to terminate Osbun's benefits unless it was arbitrary and capricious.[10]

■ Under the arbitrary and capricious standard, an administrator's judgment will not be overturned where the administrator "makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts." *Carr v. Gates Health Care Plan,* 195 F.3d 292, 294 (7th Cir.1999). In other words, it is not this Court's function to "decide whether [it] would reach the same conclusion as the [administrator] or even rely on the same authority." *Id.* Rather, the Court can only overturn the decision if it finds an abuse of discretion; that is, the decision must be "not just clearly incorrect but downright unreasonable." *Fuller v. CBT Corp.,* 905 F.2d 1055, 1058 (7th Cir. 1990); *Carr,* 195 F.3d at 294.

■ When reviewing an administrative decision under the arbitrary and capricious standard, the Court's review is limited to the administrative record. *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan,* 195 F.3d 975, 981–82 (7th Cir.1999). While parties are sometimes allowed to take discovery and present new evidence in *de novo* reviews, arbitrary and capricious review "is limited to the evi-

---

9. Osbun's complaint fails to specify which of ERISA's remedial provisions applies to his claim. (*See* Compl.) However, Auburn argues that § 502(a)(1)(B) is the only provision that Osbun can invoke on these facts (Def.'s Mem. in Supp. of Mot. for Summ. J. at 5–8), and Osbun does not dispute this conclusion. Thus, the Court treats Osbun's claim as arising under § 502(a)(1)(B) only.

10. Osbun implicitly agrees that this is the proper standard, as he repeatedly uses the language "arbitrary and capricious" to describe Auburn's actions. (Pl.'s Resp. to Def.'s Mot. for Summ. J. and Cross–Mot. For Summ. J. at 1, 3, 4, 5, 6.)

dence that was submitted in support of the application for benefits." *Id.* at 982.[11]

### 2. Auburn's Decision Was Arbitrary and Capricious

■ At first blush, Osbun's evidence that he remains totally disabled appears quite compelling. Since Osbun first began receiving disability benefits from Auburn in 1990, he has been examined three times by two different doctors, one of whom is board certified in physical medicine and rehabilitation. (Exs. B, C, K.) At all three examinations, including one that occurred only weeks before the denial of Osbun's final appeal, the doctor determined that Osbun is totally disabled.[12] (Exs. B, C, K.) Nevertheless, Auburn terminated Osbun's benefits in the face of this medical evidence. It did not base its decision on any contrary medical reports finding that Osbun is able to work, because no such reports exist. Rather, it supported its decision with only two pieces of evidence: the video surveillance tape and Dr. Oo's unsolicited phone call relating her observations of Osbun at a gas station. (*See* Ex. N.)

Auburn advances two arguments to support its decision. First, it argues that even though the medical evidence is all in Osbun's favor, the surveillance tape and Dr. Oo's phone call nonetheless prove that Osbun is capable of holding gainful em-

ployment. In the alternative, Auburn contends that the surveillance tape and the phone call at least prove that Osbun exaggerates his condition when he is being examined, and that this dissembling is all that is needed to terminate his benefits. Neither argument is persuasive.

Auburn's evidence is utterly insufficient to show that Osbun is capable of maintaining employment. First, Auburn grossly overstates the import of Dr. Oo's phone call. Auburn's letter denying Osbun's appeal says that Dr. Oo "observed behavior ... inconsistent both with [Osbun's] behavior during his examination *as well as, in her opinion, an ongoing disability status.*" (Ex. N at 2 (emphasis added).) However, Fluke's memorialization of the call says only that Dr. Oo was "concerned that Mr. Osbun might not be being totally straightforward with her when he was in to see her for his review," and that Osbun used a cane in Dr. Oo's office but did not use one at the gas station. (Ex. D.) There is no evidence that Dr. Oo retracted her earlier determination of Osbun's total disability, nor that she gave any opinion *at all* about his ability to maintain employment. Thus, her phone call provides no real support for Auburn's determination that Osbun is no longer totally disabled.[13]

This leaves Auburn with only the surveillance tape to justify its decision. Ad-

---

**11.** Osbun's brief occasionally bemoans his inability to conduct new discovery in this case; for example, he complains that "no discovery was permitted to find out Dr. Oo's true motivations" for making her unsolicited phone call to Auburn. (Pl.'s Resp. to Def.'s Mot. for Summ. J. and Cross–Mot. For Summ. J. at 2.) In light of *Perlman*, this argument is clearly without merit. Moreover, Osbun has conceded that there are no genuine issues of material fact by filing a cross-motion for summary judgment; thus, no new discovery is required.

**12.** Dr. Ribaudo's 1990 report found that Osbun is "totally disabled" and "cannot be in-

volved in gainful employment" (Ex. B at 2), Dr. Oo's 2000 report indicated that Osbun is permanently unable to return to work (Ex. C), and Dr. Ribaudo's 2001 report opined that Osbun "remains totally and permanently disabled" (Ex. K).

**13.** In addition to his cross-motion for summary judgment, Osbun filed a motion to strike from the record Fluke's memo of Dr. Oo's phone call as inadmissible hearsay. (*See* Pl.'s Mot. to Strike.) As Osbun is entitled to summary judgment even with the memo in the record, his motion to strike is deemed moot.

mittedly, the tasks Osbun performs on the tape are inconsistent with Dr. Oo's description of his physical capabilities in her July 2000 report; for instance, Osbun drives a vehicle, continuously walks or stands for over an hour, bends, squats, and lifts objects that may weigh more than five pounds. (*See* Exs. C, F.) However, evidence that Osbun can perform light physical tasks for 1.5 hours over two days falls far short of demonstrating that he is capable of sustaining a job. Auburn produced no evidence showing how long Osbun can perform such tasks, whether he can perform them on a daily basis, or how much pain he must endure in the process.[14] Rather, Auburn merely reviewed the videotape and drew the unsupported conclusion that Osbun's "ability to drive a vehicle, walk, stoop, lift, and carry heavy objects clearly demonstrates that he has the ability to perform jobs available in the economy." (Ex. N.) Auburn made no attempt to determine what those jobs are, what skills and abilities they require, or how the surveillance tape proves that Osbun possesses those skills and abilities.

Attempting to remedy this deficiency in its evidence, Auburn cites several cases in which courts affirmed the termination of disability benefits after video surveillance captured the participant engaging in physical activity. *See Patterson v. Caterpillar, Inc.*, 70 F.3d 503, 506 (7th Cir.1995); *see*

*also Delta Family–Care Disability and Survivorship Plan v. Marshall*, 258 F.3d 834, 842–43 (8th Cir.2001); *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 31 (1st Cir.2001); *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1032 (8th Cir.2000). However, in each one of these cases, the defendant supplemented its video surveillance with medical evidence of the plaintiff's ability to work. In *Patterson*, the defendant conducted *ten months* of surveillance on the plaintiff, and a doctor specializing in occupational medicine determined that the plaintiff was capable of employment after a thorough examination.[15] 70 F.3d at 505–06. In *Marshall*, the employer supplemented its surveillance of the participant with no less than *five* medical reports indicating an ability to work. 258 F.3d at 842–43. In *Vlass*, while the surveillance was the "most damning" evidence of the plaintiff's ability to work, the defendant also proffered a medical report and a vocational assessment reinforcing its conclusion. 244 F.3d at 30–32. Likewise, in *McGarrah*, the defendant rested its decision on both surveillance and medical evidence. 234 F.3d at 1032. In contrast, here the decision to terminate benefits rests solely on the strength of 1.5 hours of videotape, with no supporting medical evidence. Auburn points to no reported case affirming an employer's decision to terminate benefits

---

14. The Seventh Circuit recognizes that a disabled person's willingness to endure pain can lead to incorrect assumptions about his ability to work. *See Hawkins v. First Union Corp. Long–Term Disability Plan*, 326 F.3d 914, 918 (7th Cir.2003) ("Hawkins' unfortunate choice in life is between succumbing to his pain and fatigue and becoming inert, on the one hand, and on the other hand pushing himself to engage in a certain amount of painful and fatiguing activity. If he does the latter, it does not prove that he is not disabled.").

15. Rather than terminating benefits after only two days of surveillance as Auburn did, the

employer in *Patterson* (1) conducted surveillance for several months; (2) had the doctor review the claimant's medical files and the surveillance tapes; (3) on the doctor's recommendation, conducted even more surveillance; and (4) had the doctor examine the claimant and review the requirements of the claimant's last position with the company. 70 F.3d at 506. Only after this months-long, exhaustive investigation did the employer terminate the claimant's benefits. *Id.* Thus, Auburn's comparison of *Patterson* to the instant case is particularly inapt.

based only on surveillance evidence,[16] and some cases have found such decisions arbitrary and capricious precisely *because* they relied heavily or solely on surveillance. *See Clausen v. Standard Ins. Co.,* 961 F.Supp. 1446, 1457 (D.Colo.1997); *Rigby v. Bayer Corp.,* 933 F.Supp. 628, 634–35 (E.D.Tex.1996).

In short, Auburn reached the conclusion that a mentally retarded, illiterate, partially blind, partially deaf, arthritic man with arteriosclerotic heart disease, thyroid insufficiency, and high blood pressure is capable of gainful employment, simply because he performed 1.5 hours of light physical tasks over the course of two days, and in spite of three medical reports finding total disability. This conclusion is "downright unreasonable," *Fuller,* 905 F.2d at 1058, and Auburn has offered nothing by which this Court can find otherwise. Indeed, it must be remembered that "[r]eview under the deferential arbitrary and capricious standard is not a rubber stamp and deference need not be abject." *Hackett v. Xerox Corp. Long–Term Disability Income Plan,* 315 F.3d 771, 774 (7th Cir. 2003). Here, Auburn "seriously erred in appreciating the significance of the evidence," *Patterson,* 70 F.3d at 505, and thus its termination of Osbun's benefits was arbitrary and capricious.

Although Auburn fails to show that Osbun is capable of employment, it proffers a novel alternative, arguing essentially that it *does not even matter* whether Osbun is capable of employment. Citing *Hawkins,* Auburn claims that if it merely shows that Osbun exaggerated his disability during

medical examinations, its decision to terminate his benefits cannot be considered arbitrary and capricious, even if Osbun is incapable of employment. (Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J. and Resp. to Pl.'s Cross–Mot. For Summ. J. at 9.) In *Hawkins,* despite a medical determination of disability, the employer denied the claimant's application for disability benefits in part because "an 'activities questionnaire' that the plan had required him to fill out indicated a greater ability to work than [the doctor] had reported...." 326 F.3d at 916. The Seventh Circuit rejected the employer's argument that the questionnaire, along with other evidence, showed that the claimant was capable of employment. *Id.* at 919. However, Judge Posner noted in dicta:

> We can imagine an argument that even if the activity disclosed in the questionnaire does not indicate a capacity to engage in full-time work, the fact that it is discrepant with the level of activity described [by the doctor], presumably on the basis of representations made to him by [the claimant], fatally undermines [the claimant's] credibility. But that argument is not made.

*Id.* at 918. Seizing on this passage, Auburn claims:

> As noted by the court in *Hawkins,* [the] evidence need not demonstrate conclusively that a claimant can hold down a job. All it needs to show is a significant enough difference in behavior between the performance of a claimant in a doctor's office and observations of the

---

**16.** Cases relying on video surveillance to affirm a benefits termination invariably feature additional evidence of the plaintiff's ability to work. *See, e.g., Turner v. Delta Family–Care Disability and Survivorship Plan,* 291 F.3d 1270 (11th Cir.2002); *Armstrong v. Liberty Mut. Life Assurance Co. of Boston,* 273 F.Supp.2d 395 (S.D.N.Y.2003); *Billinger v. Bell Atlantic,* 240 F.Supp.2d 274 (S.D.N.Y. 2003); *Bekiroglu v. Paul Revere Life Ins. Co.,* 223 F.Supp.2d 361 (D.Mass.2002); *Conti v. Equitable Life Assurance Soc'y of the United States,* 227 F.Supp.2d 282 (D.N.J.2002); *Schindler v. Metro. Life Ins. Co.,* 141 F.Supp.2d 1073 (M.D.Fla.2001); *Davis v. Am. Gen. Life & Accident Ins. Co.,* 906 F.Supp. 1302 (E.D.Mo.1995).

claimant performing normal daily activities to support a reasonable inference of malingering.

(Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J. and Resp. to Pl.'s Cross–Mot. For Summ. J. at 9.) Of course, this is an obvious distortion of *Hawkins,* because although the Seventh Circuit "imagine[d]" the argument that Auburn now makes, it did not *approve* it, as Auburn seemingly suggests. *Hawkins,* 326 F.3d at 918. Tellingly, Auburn cites no other precedent, in this Circuit or any other, for the proposition that a benefits termination is reasonable as long as the claimant is caught exaggerating his symptoms to a doctor.

Auburn's "credibility" argument is not only unsupported in any prior case law, it is also unpersuasive. Again, the Plan requires the payment of benefits if Osbun is permanently "unable to engage in any occupation or employment for wages, profit, or gain. . . ." (Ex. A § 4.05(b).) Of course, it is entirely possible that Osbun could exaggerate the severity of his condition to his doctors and still be permanently unable to work. For instance, one of the discrepancies in Osbun's conduct is that he apparently walks with a cane and limps in front of doctors, but does not always do so outside the examination room. (*See* Exs. D, F.) Yet, neither a cane nor a limp is a prerequisite for total disability; even if Osbun is putting on a show for his doctors, that does not mean he is able "to engage in any occupation or employment for wages, profit, or gain." (*See* Ex. A § 4.05(b).) In short, even a liar can be totally disabled.

## V. CONCLUSION

Whether Osbun is actually capable of employment is not the question before the Court. The question is whether Auburn's *decision* that Osbun is capable of employment, based on Osbun's one-time performance of 1.5 hours of light physical tasks and despite three medical determinations of total disability, was arbitrary and capricious. The law provides that "[b]efore denying benefits, administrators of ERISA plans are required to have enough evidence to allow them to make a reasonable decision." *O'Reilly v. Hartford Life & Accident Ins. Co.,* 272 F.3d 955, 961 (7th Cir.2001). By terminating Osbun's benefits on "nothing more than scraps" of evidence, *Hawkins,* 326 F.3d at 919, Auburn ignored this requirement and abused its discretion.

For the reasons stated above, Defendant's Motion for Summary Judgment is DENIED and Plaintiff's Cross–Motion for Summary Judgment is GRANTED.

 This matter is set for a hearing to consider the relief to be provided to the plaintiff. Counsel are to come prepared to address, by stipulation if possible, the amount of benefits to which Osbun is entitled, including whether COBRA premium payments are recoverable and their amount.[17] The hearing is set for November ———————, 2003, at ——————.

---

17. After determining that an employer's denial or termination of benefits was arbitrary and capricious, a court must either remand the case to the plan administrator for further hearings or order reinstatement of benefits, depending on which remedy will restore the *status quo* prior to the arbitrary and capricious decision. *Hackett,* 315 F.3d at 776. Reinstatement of benefits is the proper remedy for "claimants who were receiving disability benefits, and, but for their employers' arbitrary and capricious conduct, would have continued to receive the benefits." *Id.* at 776 (*quoting Quinn v. Blue Cross and Blue Shield Ass'n,* 161 F.3d 472, 477 (7th Cir.1998)). Here, Osbun was receiving open-ended disability benefits which would have continued absent Auburn's arbitrary and capricious conduct. Thus, reinstatement of benefits is the proper remedy.